UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

DEBJIT RUDRA                                   Case no. 14-32872 RAM
                                               Chapter 7

Debtor

_____/



## DEBTORS RESPONSE TO MOTION TO WITHDRAW

COMES NOW Debtor DEBJIT RUDRA who moves to address the factual-inaccuracies stated in counsel's motion to withdraw by FACT and summarized herein. This debtor is a victim of an organized racketeering conspiracy contract, led by Stuart Abramson esq, with debtor's ex-wife, and her boyfriend MDPD Homicide Detective Ramesh NyBerg, which was planned and staged around his divorce. This debtor's misfortune is a direct result of a concerted engagement of domestic terrorism, as referred to in Bankruptcy procedures under 11 USC 101 (10A) Code 2331, resulting in the extortion and closing of his successful multi-million dollar company of 23 years. This debtor continues to be impacted by their criminal acts such as the kidnapping of his children, false arrests and the attempted murder by arson while debtor was at his marital home, but the listing of property withheld and in the custody of opposing Counsel Stuart Abramson, esq.

## FACTS

1. Prior to retaining a bankruptcy attorney, this debtor informed and reviewed documents demonstrating the racketeering conspiracy giving rise to the misfortune of bankruptcy. Debtor warned said counsel of the cyber-crimes targeting him and his counsel and the ongoing obstruction of justice, primarily influenced by Stuart Abramson esq. Upon retaining said counsel, this debtor specifically advised this counsel not to discuss this case, directly or indirectly with parties named in the conspiracy.
   a. Exhibit A:    Excerpt SS of 90 divorce Conspiracy (complete in Exhibit R)
   b. Exhibit B:    Spreadsheet of loss sustained during divorce conspiracy

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

2. Contrary to said counsel's motion, this debtor did comply and provide all documents requested by retained counsel and indicated in the DOJ chapter 7 bankruptcy checklist, well in advance of creditor's meeting.

3. Subsequent to providing all requested documents and financial records, this debtor was not advised of the nature of creditors meeting, and was unprepared to answer questions unrelated to debt and not outlined within DOJ Trustee guidelines.  Debtor was accompanied by substitute counsel who met him inside trustee's meeting lobby.

4. Subsequent to creditors meeting, this Debtor tried on numerous occasions to contact counsel but was unable to establish contact telephonically or by email.

5. Not obtaining response to follow-up on creditor's meeting and procedure, this debtor began to research DOJ guidelines of bankruptcy and found that Trustee should be notified of all relevant information, specifically those related to Domestic Terrorism under US Code 2331.

6. This debtor was scheduled to meet his counsel on Dec 3, but when he arrived, counsel's offices were closed.

7. Upon noting said counsel's failure to respond to unanswered concerns, this debtor found no violation in producing documents of FACT that this trustee needs to know regarding debt, and sent Trustee certified package, copying counsel on December 3, 2014.

   a. Exhibit C:    Email to Counsel regarding abandonment of client Dec 5
                    Email follow-up to counsel and trustee Dec 12

   b. Exhibit D:    Certified Package to Trustee with attachments

## ARGUMENT

This debtor has not been able to receive proper guidance or legal advice or communication replies from his counsel, and feels that his counsel may have been compromised by those engaged in the racketeering conspiracy and possibly therefore misinforming trustee of FACT.

## CONCLUSION

WHEREFORE, this Debtor Debjit Rudra and victim of organized extortion practices orchestrated by officers of the court in concert with public servants of

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Miami-Dade County, recognizes the political complexities challenging any counsel subjected to representing this debtor's best interest in the aftermath of public corruption as defined in 11 USC 101 (10A). This debtor is in FACT financially exhausted and cannot rebuild his life or continue to borrow money paying for substitute counsel who are continuously blackmailed into misdirecting him. Therefore this debtor respectfully moves to request this Honorable court to require said counsel to complete this bankruptcy as per ethical guidelines established under the Florida Bar. This debtor has paid for and is entitled to receive the needed legal guidance, options, answers or alternatives, which serve debtors best interest, and that should any additional production requirements unrelated to bankruptcy be allegedly requested by Trustee that are detrimental and unexplained by counsel, that they be forwarded as received in writing from the appointed DOJ Trustee.

Debtor
Debjit Rudra



## **CERTIFICATE OF SERVICE**

I HEREBY CERTICY that a Copy of this motion was emailed to Counsel on December 15, 2014 at vobrien@ustransportlaw.com

754 703 0248

# INTERNET PREDATOR SOLUTIONS
## UNVEILING HOMELAND TERRORISM

Miami-Dade County violations of 18 U.S. Code 2331

**Barry E. Mukamal**
1 SE Third Avenue, Ste. 2150
**Miami**, FL 33131
E-mail: bemtrustee@kapilamukamal.com
Phone: (786) 517-5760
Fax: (786) 517-5772

Certified Mail No: 7012 1640 0001 8900 4304

Re:    Case 14-32872-RAM  ..   Creditors Meeting…Document and FACT request
Bankruptcy Code 11U.S.C. 101(10A) contingency exemptions under  18 U.S. Code 2331

Dear Mr. Mukamal:

Upon researching your CPA firm, I found that you are a forensics CPA with a background in Healthcare. I am therefore approaching you for your assistance in this matter and your capacity as a federal agent representing the DOJ Trustee program.. According to the guidelines I am required to provide you with as much information and documentation you would need to conduct the discharges and address the fraudulent creditors.

Recently you were appointed trustee for my bankruptcy case. I left your creditors meeting concerned since I had never filed for bankruptcy, nor was I prepared by counsel to your lines of questioning and prepare to produce FACT, other than to explain why I am in debt. I was not prepared for a hostile interrogation area of questions one would not expect during a bankruptcy creditor meeting (by name alone). Being unfamiliar with rules of procedure required by the Trustee to enter into Bankruptcy Court files, I had to educate myself as to the process. I downloaded the regulations from the DOJ website as well as the requirements for the creditors and in this limited time, I am enclosing everything indicated and in within my possession. I hope to have the appropriate answers and documents you need to discharge my debt and hopefully lead you in the right direction as to cause.

I left your meeting concerned realizing that Stuart Abramson Esq, has misinformed you as he has been doing to judges, lawyers and others for many years. He is so corrupt that lawyers are afraid to perform in accordance with the ABA and Florida Bar or represent me. Therefore I would like to properly address the question required for bankruptcy court and place FACT on record in hopes I can unbiased your advanced misinformed perception. His signature starts when I take note of FEAR in counsel, followed by avoidance, not providing full disclosure and non-response in writing, so forth. Unfortunate for him, he and Dr. Hamlet Hassan have exhausted their ability to understand how an honest man with character and integrity will evolve during times of adversity and oppression.

I recall you announced being a CPA, and in your opening question you asked if I had ever been indicted. Additionally, you focused on details of alleged criminal records, specifics about the fraudulent lawsuits and situations you should not be aware of, but angled with a distorted perception of the truth. I prefer you record the truth about the reason for this bankruptcy, involving legal malpractice, insurance fraud, kidnapping, Arson with intent to Kill, and most of all the conspiracy RICO violations orchestrated by both Stuart Abramson esq, and Daryl Jones esq with the assistance of MDPD Homicide Detective Ramesh NyBerg engaged in crimes established under 18 US Code 2331 Domestic Terrorism.

I am a quick learner, and when history repeats itself, the better I see through confusion, corruption, deception and FEAR… I have witnessed four years of Stuart Abramson esq, illegally contacting my attorneys, in my divorce



INTERNET PREDATOR SOLUTIONS
UNVEILING HOMELAND TERRORISM

case, and bankruptcy and blackmailing them into misleading me with empty promises by holding my children as bait/hostage, and the consequence has in fact placed me in front of you today.

I now become very concerned when a judge or public official attacks my character for the benefit of a public audience to establish perception by asking leading questions in an accusatory manner, hoping to obtain solicited answers required by Abramson Esq. Needless to say, rather humiliating in front of a new employee and the first bankruptcy attorney I found in four years which was not approached by Abramson in advance, *(Illegal access to ISP browsing history provided by COMCAST Miramar)* and forced to decline me. This is criminal/law-enforcement protocol to confuse dishonest people by unexpectedly placing one on the defense. In the last four years, the behavior is consistent with everyone illegally contacted and tampered with by Stuart Abramson Esq and Darryl Jones, Esq.. It is unconstitutional for this procedure to be conducted in the court of law and obstruct the respondent from providing the truth in Court. The courts are constitutionally established by the American people to seek and uphold the Truth and Justice for all. It should not be abuse to document non-factual official paper-trails which only benefits lawyers and healthcare officials having unclean hands. More-so, tax-payers have the right to expect that local law-enforcement should protect them from white collar crime. Law Enforcement should not be abused by officers of the court to be abused to secure a paperless playground allowing them to legally commit white collar extortion and life-insurance fraud, and establish a paper-trail pointing to another. According to the Department of Justice, Bankruptcy court is designed to investigate those types of creditors and notice the appropriate authorities.

In the meeting, you touched upon the truth for a second when you brought up Domestic Terrorism as defined under Bankruptcy law and defined under 18 US Code 2331. You also touched upon the Lawsuits and focused on what Abramson would like everyone to think and focus on and rush past recording the FACT on record. The lawsuits were mostly fictitious plaintiffs and all of them were heard or not heard in front of a judge, without sending me notice and rubber stamped by the judges. You never gave me an opportunity to prepare a response and you were writing and passing around notes I have no clue to their purpose. I have enclosed the Bank Statement of my company, and a few other evidentiary documents to demonstrate what you really need to know and establish on federal record not only for me, but for the hundreds of other victims he has engaged since September 11, 2001. **Americans should not be afraid or penalized for telling the truth in court.**

You also tried to lead me into limiting the type of services I performed in the company I once owned. Although I don't have a clue as to what difference it makes in a bankruptcy, upon reviewing your portfolio, I am surprised you didn't know what a Health-Care EOC logistics consultant does. Particularly since you were involved in the sale of Pan American a few months after I provided them my audit analysis. In my profession, I am trained by the United States Naval Logistics for the USS Saratoga carrier group, and awarded by the Secretary of the Navy for finding and closing holes in the procurement system... As you should know, most of them in healthcare are created by procurement contracting officers, and are officially camouflaged by in-house accounting by re-allocating cost center or they keep two sets of books for auditing. One being manual old fashion index cards to collect payment from the beneficiaries on pass through expenses.

I am the one who stumbled upon this practice in many hospitals and particularly at CHI in 2002, when I found an entire organized system operated of embezzlement practices established by the HCH Accounting department, Reginald Clyne Esq, and Alejandro Trujillo. of laundering hundreds of thousands of dollars a month of healthcare funds... Anyone with clean hands would want me on their team, specifically a CPA forensics auditor... After all, this department would be accountable for all purchases passing through any facility and that is why a lot of accountants, lawyers and purchasing contractors with unclean hands **FEAR** me.

# INTERNET PREDATOR SOLUTIONS
## UNVEILING HOMELAND TERRORISM

I have served the taxpayers best interest in passing on health costs at the lowest unit per patient day and took an oath , **NOT TO "Look the Other Way"**... (THAT IS NOT A CRIME-THAT IS DOING THE RIGHT THING) So, I needed this to go on record as I didn't know this was a mandated answer in Bankruptcy court when you deviated from allowing me to provide the answers. When I assumed the logistics contract for CHI in 2002 and I was unaware that I had become a target because I was opposed to approve unauthorized/unjustified purchases and refused to "LOOK THE OTHER WAY", but attempted to implement an automated inventory management systems for 100 % reconciliation. Accounting only has to reconcile paid invoices against a purchase and classify the expense. I had to reconcile both ends. That is why the United States Navy commended me. If not, we would have F-14s still being built in the backyards of every terrorist overseas. I hope now you have an accurate answer of what type of services I used to provide for 25 years, as opposed to the one Abramson was fishing for.

In closing, I invite your forensics assistance of all additional records, bank statements, etc, as they will point back to the truth. The FACTS will show why they kidnapped my children and entered into a 90 day conspiracy contract with the benefits of illegally using DOD technology illegally into force me into Bankruptcy, a Mental Institution or Reverse Homicide by organizing lawyers with unclean hands, bypassing the clerk of courts to appoint their pre-briefed judge, controlling the MDC Police Chief, court preferred psychologists to document in violation of APA guidelines, and blackmailing the judges. This is the system of renegade law-less justice created by criminal **attorney Stuart Abramson Esq, MDPD Homicide Ramesh NyBerg, Daryl Jones Esq, and the Behavioral Modification services of Dr. Hamlet Hassan**, who have made a 30 year career by doing favors for public servants, in return for future payback when called upon or face the **FEAR of Blackmail**..

My statements are FACTUALLY documented but never allowed to be heard in the FCS, and closed by the UNILATERAL hogwash prejudicial judgment Stuart had the judge sign and filed without cooperating with retained counsel or noticing me. Witnesses are the three lawyers he threatened not to inform me who I had retained as counsel... Spencer West esq, Nelda Laurence Esq, Jerry Adams, esq, and Leone Sharpe Esq. Now why would a man allow a criminal attorney to bypass four lawyers and allow a blackmail controlled judge to sign a paper awarding my ex control and denial of my children; award me the marital home, but not release the listing to me so I could do something with it? After not giving the **judge permission** to schedule any hearings or allow the judge to recuse himself, he had his adjuster write a Fire Hazard policy on the home three months prior to blackmailing my ex accountant and housekeeper set it on fire at night. I have all the documents you can request to prove this in any nationalized TV Jury Trial.

As I find, he is still illegally wire-tapping me and continues to illegally contact and threatening my attorneys into not preparing me for legal proceedings, not placing things in writing, providing bad, but faultless advice, and NEVER enter any FACT or truth to be filed in the courts. (Intelligent people research... He is made a career out of hustling with criminals) It makes it even more difficult to capture proof when he prohibits court reporters from providing unaltered transcripts. (Alan Levine)

I hope I am providing you enough proof to be able to see how this group of individuals place innocent victims like myself in your jurisdiction. Not what Abramson wants to establish on court record to maintain clean Hands, since the weapons he uses leave no fingerprints and the medical examiner has received too many favors, not to certify cause of death according to Abramson's pre-meditated accidental tragedy. For God Sakes, his partner and accomplice is, none other than Detective NyBerg, Author and Novel writer of the Murder Mystery section of the Police Digest Magazine...

Please let me know if you need any other proof in order to discharge my debt so I can go on with my life. He had the MDPD illegally seize all of my unburned documents and hard drives so I will provide you with everything listed in the Guidelines as established by the DOJ. All I ever wanted was my children, father and civil rights...

# INTERNET PREDATOR SOLUTIONS
## UNVEILING HOMELAND TERRORISM

Kidnapping is a crime you know... This is America. I am a Law-Abiding Citizen with an allegiance to our Federal Government to uphold the truth. The courts are designed to enforce them and to serve as political asylum for those escaping oligarchic governments such as in Cuba. Not to emulate them.

Regards
Dave Rudka

Cc:  Confidential Recipients

Enclosures:  Listed as EXHIBITS

11 USC 101 A .. Bankruptcy referral  18 US Code 2331

Exhibits

A-1    A-2    RICO conspiracy estimated annual revenue/income asset loss   US Code 2331
B-1    **June 29, 2012** Demand by Stuart Abramson Esq, Hold Harmless on Marital Home   10321 SW 140 St 33176
B-2    June 29, 2012. Notarized Compliance  (Exchange for empty promise to allow contact with children)
C      **June 13, 2012.**  Fire Hazard Insurance Policy issuance taken out by Abramson on Marital Home
D      July 21, 2012.   Emails to Stuart Abramson's listing agent to release marital property to me . Refused.
D-1    Marital Home before "Arson with Intent to Kill"
D-2    Marital Home immediately following 911 demonstrating MDC Bulldozer destroying scene of crime
E-1 2, 3.        Statement by Private Investigator Eric Chandler and Cedric Stephane of Arsonist
       CPA Robert Aguero... HCN VP of Fiscal Affairs  &  Kashara Ward. Army Intelligence Special Agent
F      April 26, 2013. Correspondence to Foreclosure Counsel Sonia Amador enquiring why Mortgage records of
       marital home    were purged from Wells Fargo Data Banks. No records found of $1.2 million dollar
       investment property.
G.     SS of Vivian NyBerg... Ex-wife of Dade County Official "Murderer For Hire" describing 90 contract to
       collect on Asset, Company Revenue and Life Insurance Policies > $3 Million combined with ADD
H.     Summary of False Arrests you inquired about and as it relates to Abramson as the Contracts Administrator
I.     Statement of PI Elane Dyer, discovery of Payroll and Bank RICO... Observe Det. Biaxali
J-1, J-2 July 2010 T-Mobile Bill.  Observe all calls on page J-2 permanently deleted on official record bet 6/23 and
       7/04.  Period of being drugged and threatening calls describing how to commit suicide. Where is 911
       call?
K      **Proof of Company Funds being garnished without hearing or bank notification, closing company down.
       So, contrary to what Start Abramson wants you to believe.... I have NOTHING TO HIDE**
L.     SS former employee describing the continuity of Inside conspirers embezzling payroll fraud
M.     Case Review and psychological assessment post trauma of "Arson with Intent to Kill"
N.     Certified Letter to West, requesting Legal Expense Justification for extortion.
N-1 N-2.        Accounting summary of first two years of legal extortion and IT Expences.
O.     Expert From Fire Science Expert Report describing Federal Violations by MDPD in Arson Investigation
       Procedures
P1 -3. November 28, 2014  IT Forensics report confirming FCC violations by Abramson.  Denial of contact to
       Charlie Crist law-firm
Q.     Child Support Obligation notice Sept 26m 2012..  Paystubs already provided confirm compliance.

UUSC 101 A

**Force**

| | |
|---|---|
| **From:** | Force <Force@ipredator.solutions> |
| **Sent:** | Saturday, November 22, 2014 5:40 PM |
| **To:** | vobrien@ustransportlaw.com |
| **Cc:** | asolomon@ustransportlaw.com; anikolaidis@ustransportlaw.com; sandairwater@gmail.com; w.washington221@gmail.com; jshlackman@comcast.net |
| **Subject:** | RE: Barry Mukamal Trustee Forensics White Collar Crimes CPA     ...... 11 U.S.C. § 101(10A). |

1.  The "current monthly income" received by the debtor is a defined term in the Bankruptcy Code and means the average monthly income received over the six calendar months before commencement of the bankruptcy case, including regular contributions to household expenses from nondebtors and including income from the debtor's spouse if the petition is a joint petition, but not including social security income or certain payments made because the debtor is the victim of certain crimes. 11 U.S.C. § 101(10A).

**(10A)** The term "current monthly income"—
**(A)** means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—
**(i)** the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521 (a)(1)(B)(ii); or
**(ii)** the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521 (a)(1)(B)(ii); and
**(B)** includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

**(5)** the term "domestic terrorism" means activities that—
**(A)** involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
**(B)** appear to be intended—
**(i)** to intimidate or coerce a civilian population;
**(ii)** to influence the policy of a government by intimidation or coercion; or
**(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
**(C)** occur primarily within the territorial jurisdiction of the United States.

**From:** Force [mailto:Force@ipredator.solutions]
**Sent:** Saturday, November 22, 2014 5:11 PM

1

**HCN RICO: Alejancro Romelio, Reginald Clyne esg, Robert Aguero**
**MDPD Detective Ramesh NyBerg and Stuart Abramson esq. 2002-2005...2008-Current**

Begin Racketeering NO-CAUSE loss of Business upon discovery of Money Laundering at CHI HCN.

| Cleint | Monthly | | Annual |
|---|---|---|---|
| Stanely Myers HCN | $ 11,000.00 | $ | 132,000.00 |
| North Miami Beach HC | $ 3,600.00 | $ | 43,200.00 |
| East Ridge Village | $ 9,500.00 | $ | 114,000.00 |
| CBRE Dadelano | $ 21,500.00 | $ | 258,000.00 |
| CHI WALKED AWAY | $ 48,000.00 | $ | 576,000.00 |
| **TOTAL PASSIVE** | **$ 93,600.00** | **$** | **1,123,200.00** |

UNTIL 2002. WAS LTC% ON BID AWARDS
NO LOSS EXCEPT SOUTH SHORE HOSPITAL IN 1998 CLOSED BY FBI MEDICARE FRAUD

**RICO: MDPD/MAYOR/HCN Stuart Abramson esq, Daryl Jones esq, Ramesh NyBerg, Rip-Off**

| 2008 - Current | 18 U.S. Code § 2331 | | | |
|---|---|---|---|---|
| Cleint | Monthly | | Annual | Term Date |
| BHE | $ 195,000.00 | $ | 2,340,000.00 | 3-Jul-09 |
| Homestead Hospital | $ 60,000.00 | $ | 720,000.00 | 9-Feb-09 |
| Brickell | $ 32,000.00 | $ | 384,000.00 | 14-Jan-10 |
| Lear Medical | $ 6,750.00 | $ | 81,000.00 | 30-Jun-10 |
| Royal Palms | $ 12,000.00 | $ | 144,000.00 | 15-Jul-10 |
| Gail Park I | $ 6,700.00 | $ | 80,400.00 | 1-Mar-11 |
| Gail Park II | $ 5,400.00 | $ | 64,800.00 | 1-Mar-11 |
| Snapper Creek | $ 4,700.00 | $ | 56,400.00 | 1-Mar-11 |
| South Lake 1350 | $ 750.00 | $ | 9,000.00 | 1-Mar-11 |
| South Lake 1400 | $ 750.00 | $ | 9,000.00 | 1-Mar-11 |
| 999 Ponce | $ 7,000.00 | $ | 84,000.00 | 1-Mar-11 |
| WaterFord | $ 6,500.00 | $ | 78,000.00 | 1-Mar-11 |
| Kendar Building | $5,750 | $ | 69,000.00 | 1-Jun-12 |

| | | | | Estimate loss Payroll/Bank Fraud/expences |
|---|---|---|---|---|
| **TOTAL AGGRESSIVE** | **$ 343,300.00** | $ | 4,119,600.00 | **$255,000.00** |

| Loss of Credit an Equity 2010 | | | | Estimate loss Arson attmp Murder | | |
|---|---|---|---|---|---|---|
| Suntrust | | $ | 98,000.00 | Furnitures | $ | 170,000.00 |
| Wachovia | | $ | 100,000.00 | Int Collectables | $ | 300,000.00 |
| Home Equity/Cash | | $ | 710,000.00 | Audio Video PC | $ | 60,000.00 |
| Total | | **$** | **908,000.00** | Upgrades on home | $ | 225,000.00 |
| | | | | Clothing Misc | $ | 15,000.00 |
| Legal Expences through 2012 | | **$** | **222,562.00** | **Total Est Arson** | **$** | **770,000.00** |
| IT Network Security / - 2013 | | $ | 62,000.00 | | | |
| Total | | **$** | **284,562.00** | **IRREPLEABLE LOSS** | | |

*CHILDREN*
*REPUTATION / CARREER*

**Other Expences**
**Stay Away Order Relocation**

*FAMILY&RIENDS DUE TO CHAR ASSIN*
*COMPANY 25 Yrs GOOD NAME*

| Hotel Travel | | $ | 6,000.00 | *Civil rights* |
|---|---|---|---|---|
| Apartment-Security Rent | | $ | 10,000.00 | *Freedom* |
| Furniture Fixtures Electronics Houseware | | $ | 20,000.00 | |
| Clothing | | $ | 3,000.00 | |
| | | $ | 39,000.00 | |
| | | $ | 78,000.00 | |

Begin Continue to Follow me on Genesis

| FHC HN | | $425,000 |
|---|---|---|

| **TOTAL EST ANNUAL REVENUE LOSS RICO** | | **$5,892,800.00** |
|---|---|---|
| TOTAL EST CASH / LIQUID ASSETS LOSS RICO / ARSON | $ | 1,678,000.00 |
| TOTAL EST EXTORTION EXP LEGAL - IT MISC | $ | 362,562.00 |

**RICO: MDPD/MAYOR/HCN Stuart Abramson esq, Daryl Jones esq, Ramesh NyBerg, Rip-Off Reginald Clyne Esq, Leone Sharpe Esq, COMCAST, South Florida Maintenance Compeititor**

2008 - Current        18 U.S. Code § 2331

UNTIL 2002. . WAS 100 % ON BID AWARDS  NO HISTORY OF LOSS
NO LOSS EXCEPT SOUTH SHORE HOSPITAL IN 1998 CLOSED BY FBI MEDICARE FRAUD

**PENDING AWARD LOSSES RICO**
Placement of Nestor Ramirez, Detective Ramesh NyBerg and Jennifer Alvarez Inside
2008 - 2013

|  | Monthly | | Annually |
|---|---|---|---|
| Beckman Coulter | 55,000.00 | $ | 660,000.00 |
| **Comcast** | **48,000.00** | **$** | **576,000.00** |
| Leor Medica. Group | 97,000.00 | $ | 1,164,000.00 |
| Brickell Village | $ 8,500.00 | $ | 102,000.00 |
| TOTAL NEGOTIATING | $ 208,500.00 | $ | 2,502,000.00 |

RFP Final Stages  RICO:  SFM-Clean All-CBM

Proposal Request
1450 Brickell
1401 Brickell
Plaza 57

| | | |
|---|---|---|
| Baptist Health | $ | 2,340,000.00 |
| Bet Shire | $ | 113,172.00 |
| Palace Condo | $ | 136,864.00 |
| Total Bank | $ | 167,178.00 |
| Sunset Proff | $ | 861,295.00 |
| 9350 Bldg | $ | 115,350.00 |
| 8710 Bldg | $ | 31,200.00 |
| Amadeus Centre | $ | 174,925.00 |
| Bupa Int | $ | 138,592.00 |
| Mellon Financial | $ | 569,751.00 |
| Dadland Towncentre | $ | 172,672.00 |
| Greenwhich Condo | $ | 78,252.00 |
| JCC | $ | 34,320.00 |
| Williams Island | $ | 175,968.00 |
| Pinacle Towers | $ | 137,036.00 |
| 1101 Brickell | $ | 711,378.00 |
| Washtington Tower | $ | 197,039.00 |
| Divine Square | $ | 106,545.00 |
| 1 Flagler | $ | 65,195.00 |
| Pro-Med | $ | 122,356.00 |
| 444 Plaza Rivergate | $ | 322,287.00 |
| JTCHC | $ | 425,000.00 |
| Total RFP Final | $ | 7,196,375.00 |

**TOTAL RICO COMP MDC**        **$ 9,698,375.00**

*ABRAHAMSON REQUEST TO HOLD HARMLESS*

**Dave Rudra**

**From:** Stuart Abramson <lawstu08@gmail.com>
**Sent:** Friday, June 29, 2012 2:25 PM
**To:** Dave Rudra

Mr Rudra:

Tuesday (7/3) or Thursday (7 5) are fine to come by in the afternoon: just let me know when.

It is preferred that you just reprint the Hold Harmless and Indemnification Agreement and sign and notarize it INDEPENDENTLY as opposed to in my office.

You may bring it with you, however, when you drop off the check; or just have both delivered if that is more convenient.

Please let me know when I may expect delivery of the check and ORIGINAL signed and notarized Hold Harmless/Indemnification Agreement.

Thank you.

*WHY DEMAND A HOLD HARMLESS AGREEMENT IN EXCHANGE FOR EMPTY PROMISE OF CONTACT WITH CHILDREN?*



## HOLD HARMLESS AND INDEMNIFICATION AGREEMENT

I, Debjit Rudra born 10/07/1963, hereby agree to Indemnify and Hold Harmless, Mandira Rudra born 07/28/1972, from any and all claims, potential claims, expense, legal actions, administrative actions, and/or actions of any type or nature by any Mortgage Company, Lender, Government entity, creditor, or any other related representative or anyone else with respect to any liability or potential liability and/or penalties or claims for any reason with respect to the Mortgage, Foreclosure, Sale, Lien or other disposition of real estate commonly known as 10321 SW 140" Street , Miami, Florida 33176.

In exchange for protection, Mandira Rudra will sign over exclusive use and rights to the marital home to Debjit Rudra in Quit Claim Deed and/or documents to transfer title to a Short Sale Buyer or back to Mortgage Company on a Deed in Lieu of Foreclosure. In the event that Mandira Rudra delays the assignment beyond July 5, 2012 or other unforeseen circumstances in which a foreclosure precedes the opportunity to sell the marital home, then both parties will remain jointly liable for the debt associated with the foreclosure.

Dated:

                                                          DEBJIT RUDRA

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

Sworn to and Subscribed before me on the  day of  , 2012, personally appeared Debjit Rudra who has produced   as identification.

TARIK LOPEZ70
Notary Public : State of Florida
Commission # DD 946249
Bonded Through National Notary Assn

Notary Public - State of Florida at Large



**EXHIBIT**

June 13, 2012

DEBJIT RUDRA
MANDIRA RUDRA
10321 SW 140TH ST
MIAMI, FL 33176-6648

Re: NOTICE OF PLACEMENT OF INSURANCE POLICY
Wells Fargo Home Mortgage Loan Number: 0042333666
Property Address: 10321 SW 140TH STREET
MIAMI, FL 33176

Policy Number: ALP21203569960          Insurance Company: AMERICAN SECURITY INSURANCE COMPANY
Effective Date: 05/30/2012              Expiration Date: 05/30/2013
Coverage Amount: $483,039

We have enclosed the renewal policy for fire insurance on your property obtained by Wells Fargo Home Mortgage. The annual premium for this coverage is $7,352.30 for a twelve-month policy. Your monthly mortgage payment will be adjusted to collect for the cost of the new coverage.

Upon receipt of acceptable coverage, this policy will be canceled. You will be charged only for the days that this policy was needed. Any unearned premium will be refunded on a pro rata basis.

Wells Fargo Home Mortgage has placed this insurance policy on your property because we have not received satisfactory evidence of insurance coverage as required by your loan documents. Please consider the following facts concerning this insurance policy:

- This policy insures your property for fire, extended coverage, and vandalism up to the stated limits contained in the policy.

- The coverage provided in this policy may not be as comprehensive as the previous policy secured by you, and the limit of liability may be unacceptable to you.

- The cost of this policy is probably greater than the cost of comparable coverage obtained through your own insurance agency. This policy was obtained with the assistance of Wells Fargo Insurance, Inc., a licensed insurance agency and affiliate of Wells Fargo Bank, N.A. Wells Fargo Insurance acts as an agent for the insurance company and will receive a commission on the insurance that was obtained.

- This coverage varies from the usual homeowner's fire policy. It provides coverage for physical damage to the structure only.

- Due to varying construction costs, the insurance provided by this policy may not be sufficient to restore the property in the event of a total loss.

**Dave K. R**

EXHIBIT

| | |
|---|---|
| **From:** | Dave@Genesismanagement.us |
| **Sent:** | Saturday, July 21, 2012 10:18 AM |
| **To:** | dicewon@gmail.com |
| **Cc:** | w.washington221@gmail.com; Dave@Genesismanagement.us |
| **Subject:** | RE: Hold Harmless Agreement. |

Len,

Per you benefit, you have the right to rebuttal and explain why your listing is not misleading, and or any of the other factual concerns for alarm I have listed below. Please do so with fact and not just denial or per telephonic explanation.

Dave

--------- Original Message --------
Subject: Hold Harmless Agreement.
From: <Dave@Genesismanagement.us>
Date: Sat, July 21, 2012 8:52 am
To: dicewon@gmail.com
Cc: w.washington221@gmail.com, Dave@Genesismanagement.us

*[handwritten notes: DATE refers to ... Wells Fargo ins Date policy. Fire Hazard ... 100]*

Len

Recently we discussed the Hold Harmless agreement that Abramson wanted me to sign to protect the wife. You explained to me that such an agreement only protects the wife for damages to the house. Immediately after she signed it, coincidentally you approached me with a cash offer of a month to month renter who wanted to rent the home, alleging the lead was from your new girlfriend.

I suspect that if I had been desperate to make a dishonest buck, my house would have been on fire and I would be in a whole lot more legal problems. Why else would a criminal attorney want such a waiver and who is you your new girlfriend, representing which brokerage. I can bet is was a renter coming to you from Dina, courtesy of Abramson. I proved that to you right after Abramson received the child support check.

Dave

-------- Original Message --------
Subject: RE: Listing. 4th and final request to remove listing
From: <Dave@Genesismanagement.us>
Date: Sat, July 21, 2012 8:26 am
To: dicewon@gmail.com
Cc: w.washington221@gmail.com, Dave@Genesismanagement.us

Good morning Len,

I am following up this morning's conversation via this email. As of today, the listing remains posted reflecting a misrepresented status to buyers and definitely never disclosed to me when you made me sign the listing agreement. Moreover, you never told me that Dina was Abramson exclusive broker from which he makes a percentage for the listings he gets for her and she guided you to contact me during this divorce. A significant amount of confidential information including finances were privy to you, compromising our position since you did not disclose Abramson's relations with DRE. **Furthermore, this was not disclosed to the investors who flew in from Virginia or Wilson**

1



# INTERNET PREDATOR SOLUTIONS

## ARSON WITH INTENT TO KILL.  FEBRUARY 13, 2013

<u>10321 SW 140 st.  Miami Florida.  33176</u>   .

Pictures taken by MDPD indicating clear evidence of explosions in attic and Charlie fire.  Pictures show only smoke fire damage to interior of residence.  All original evidence shown was remained subsequent to the county bulldozer and firemen conducted their illegal seizure of all computers, surveillance and electronic devices containing evidence of crimes conducted by **Detective Ramesh NyBerg, Mandira Bose, and Robert Aguero with the assistance of the MDPD, for listing of the home, held by Stuart Abramson esq..**    Pictures Before and After.  Note Furniture Equipment and all documents not burned, but sustained only smoke damage, while  entire roof is missing due to the FPL initiated power-surge to explosives in sequence of the four quadrants the attic grid by rewiring with the fuse box.





Family Room and Genesis area at listing.  Note table in center.

Kitchen area facing towards Living room.

Dining room area facing Living room where HK **Kashara Ward** set fire to valence against window.














## DETECTIVE RAMESH NYBERG AND MDPD CONSPIRACY ON ARSON, INTENTIONAL DESTRUCTION OF CRIME SCENE, ILLEGAL SEARCH AND SEIZURE WITHOUT WARRANT, PLANTING OF EVIDENCE AND FALSIFYING ARREST REPORT TO OBTAIN ARREST WARRANT ON TRUE VICTIM.  DID NOT QUESTION WITNESS AND PRIVATE INVESTIGATOR WHO WITNESSED THE TWO CRIME-SETTORS/SUSPECTS WITH MOTIVE.

Picture of County Hollander bulldozing through property without permission, warrant and right directly in the path over area alleged samples were taken to allege Arson, SUBSEQUENT TO THE DAMAGE caused by Hollander Bulldozer.  Consistent with intentional destruction of evidence in a crime scene and fabrication of FACT.  As indicated in sample sketch diagram.



Unquestionable remains and footprint of a Charlie Fire, set in the attic, possibly with electrically activated detonating relays placed in four quadrants and by-passed by re-wiring of the fuse box.  Request to subpoena FPL records was ignored by Counsel.  Consistent with work of a professional explosives expert, trained in the anatomy of a fire, so that it did not burn the Divorce case and Intellectual property crimes files and hardware forensics.  Confiscated without a warrant or permission in an Illegal Search and Seizure by the MDPD.





# ARSONISTS AND EMBEZLEMENT

September 3, 2013

**Arson Case No. F13-008456** 10321 SW 140 ST. Miami, Florida 33176
DESTRUCTION AND TAMPERING OF ARSON CRIME SCENE LOSS

**ARSON SUSPECT WITNESSES NOT INTERVIEWED OR DEPOSED AND OMMITTED FROM POLICE AND ARREST AFFIDAVITS.**

Statements Enclosed:

1. **Private Investigator Eric Chandler   License Number 1000298**
2. **IT Technician Cedric Stephane D.**

Please find attacned the witnesses at the Scene of the crime and reported to **MDPD LEAD Fire Investigator Lt. Diane Castillo**:

The following two witness names were given to Lt. Castillo the morning after the fire in the sworn statement taken, but omitted and never questioned. Later, upon retaining Atty: Grace Casas, esq, Private Investigator Eric Chandler was asked by Grace Casas to report to State Attorney's office and give official statement. Eric Chandler did so, but claimed no notes were taken or recorded. These critical suspects appear to nave been intentionally harbored in this crime.

A week after the fire, upon meeting with both Eric Chandler and Cedric Stephane, a description of the two suspects reported was asked by myself. They both reported a middle aged Hispanic male and a younger white female naving black hair and wearing baseball hat backwards was the one who stepped out.

They were both shown facebook pictures of **Robert Aguero**, former accountant and client JTCHC VP of fiscal affairs who was caught embezzling company funds, and **Kashara Ward**, recent housekeeper caught two weeks earlier cashing check with forged signatures. They both stated that individuals in the Black SUV truck getting out of truck in the driveway, resemble the people in the pictures below, placed in Facebook.

A week after Grace Casas filed notice and was repeatedly requested to interview or depose the suspects below, she repeatedly stated she did not have **"permission"**. (Later I learned from the divorce JA, ALL permission was to be given to all representation and/or informants from **Stuart Abramson, esq**)



Kashara Ward.   **Army Special Agent Informant**, claimed she was paid to listen when working as HK

Identified Arson suspect on property 2 hours prior to fire.   Black SUV Truck



Robert Aguero.   **VP of Finance JTCHC** - **Account for Clean Image** caught embezzling payroll funds through staff

Identified Arson suspect on property 2 hours prior to fire.   Black SUV Truck

E-2

To whom it may concern

I was hired by Peter Hoodanto to do some investigation to check for hidden cameras & tracking device at his residence and vehicle located at 10200 SW 140 St Miami FL 33176. I was also going to get him a quote on his home security system in a couple of days.

My name is Paul Jacques. I am a private investigator working for Tiperon.

On February 23, 2011 approximately 3.30 PM, I witnessed a black SUV drive by Dave's residence.

I was sitting across a house but in front of Dave's residence surrounded by trees with Sedric Stephane D.

I was about 20 to 30 feet away from the street.

The driver was a white man, medium build, possibly Hispanic male. The passenger was a white female, small build, she was in a casual attire, possibly khaki had khaki dark color hair shoulder length possible in pony tail.

The black SUV drive up to the side of the street towards Dave's house. They went one house down and turned around on a parking lot that had a for sale sign and drove away. About two minutes later the black SUV came back again and stopped below a white Hyundai that was parked in his driveway. The window came down on the passenger side and the passenger got onto the step of the black SUV. She took like she was going to look over the wall onto Dave's driveway. She got back into the black SUV and the vehicle then drove away.

Tiperon A. Jacques

License Private Investigator

Eric Chardie

[illegible signature line]

E-3

To whom it may concern:

On February 24, 2013, a little after 4:30 PM, I witnessed a Black SUV stopping by Dave's house. I was about 20 feet away from the vehicle, sitting at the table on the patio with Eric (Private Investigator), and I could see clearly, a white male as a driver and a white female stopped in front of the drive way, getting out and looking around.

We were hidden by the bushes and could see everything without being seen, and after 2 minutes approximately these persons could't see anything behind the bushes, so the car moved 10 feet forward and started to drive back and forth, then they saw us and drove away.

Cedric Stephane U.



**Force**

| | |
|---|---|
| **From:** | Force <Force@ipredator.solutions> |
| **Sent:** | Wednesday, December 3, 2014 9:29 AM |
| **To:** | 'sonia@samadorlaw.com'; 'mailto:legal1@samadorlaw.com' |
| **Cc:** | 'file@ipredator.solutions' |
| **Subject:** | FW: Time Sensitive Evidence needed.  Missing Account...............Sonia Amador........BANKJRUPTCY REQUIREMENTS  (Section 341a) |

**Importance:**      High

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | 'sonia@samadorlaw.com' | Read: 12/3/2014 9:59 AM |
| | 'mailto:legal1@samadorlaw.com' | |
| | 'file@ipredator.solutions' | |

Good Morning Sonia;

Please refer the email below, dated April 26, 2013. You never answered any of my questions and I am now trying to clear up all the legal misdirection's for bankruptcy court. You knew they falsified the Arrest Affidavit after they set my home on fire, yet according to Grace, you did not respond to her requests to set the record straight so I did not have to endure a year and half of harassing abusive continued legal extortion, gang-stalking and character assassination by the Social Media law-firm of Rip-Off Report?

Abramson has been contacting every attorney for the past four years and threatening them not to assist me with my bankruptcy. Now I finally found one and I don't want them to be compromised because of what is going on between Abramson, Jones and HCN. I have been studying the pdf 489 kb form to educate myself in the process of bankruptcy law as well as the requirements of 341(a) and want to package the requirements to the Trustee. I found that Abramson has again violated constitutional black letter law guidelines and misdirected him.

During the discovery process of the Arson, I recently looked over the Wells Fargo documents. First of all, I still have not got an answer as to why my mortgage loan account number was purged in the Wells Fargo system and could not be found. You even asked me not to report the fire, which I found very suspicious. Secondly, I found a letter from Wells Fargo indicating Abramson had his adjuster take out a Fire Hazard Insurance policy, a few months before the fire and he never released the listing agreement to me subsequent to the unilateral judgment he filed and had signed without noticing me, in which he awarded me the marital home.

I would like some answers please, as to what transpired at Wells Fargo and why do you not know and did not inform me that he took out a Fire Hazard policy while I was living in it? Does this mean that since he did not succeed in homicide by asphyxiation, that I am now entitled to the policy. I mean I see it lists his client and myself and the beneficiary??? Had he been successful in the explosion, by default, would not have they received it and built a new home on top of my grave???

And if he had Alejandro Trujillo of the HCN get through to the IT infrastructure, then perhaps Wells Fargo would never know it was paid. Is that why Darryl Jones dispatched the MDPD Police Chief Patterson run a bulldozer over the scene of the crime and confiscate all my evidence? Then why did they forget one burned hard drive?. .   Since it was NEVER ARSON, smoke damage doesn't destroy all recoverable data you know... They had set-aside an ECU detective Castillo to conduct the procedural duties duties of a specialty trained Arson Investigator, who later asked me how did I know so much about the anatomy of a fire and retrieve all the emails.... Federal Arson Investigation has

1

www.windows-universe.org



**From:** Dave R...... ...:lto:cave@genesismanagement.us]
**Sent:** Monda,  .. = 2013 6:18 AM
**To:** Grace Cas:,   sta. Roland
**Cc:** dave@ge... ...agement.us; w.washington221@gmail.com
**Subject:** FW: T... Sensitive Evidence needed. Missing Account...............Sonia Amador

Grace;

As we spoke, below is the thread between myself and Sonia Amador – foreclosure atty. Recall I said she avoided me for a month after the fire, finally giving me an appointment to see her a week before the arrest. In my thread, note that I referred to her asking about me having a girlfriend. In her rebuttal, she branched off into tangents, but did not defend herself in that question. Timing is why I put her together with Daryl Jones. Recall, after bail being posted, they kept me in jail for three days until Wilson flew down and got me out. If I did have a girlfriend, they would not have been able to keep me three days after bail. They did not count on Wilson. Coincidently, they froze our BB&T bank account the day I was in jail. Wilson had to use another account to post bail and buy his ticket, but he got it done.

Did she ever get back to you?

Also, I have become aware that Stuart Abramson has been circulating a maligning invalid psychological report authored by Dr. Edward Schezcowitz, which was dictated by my ex-wife and Stuart. This was shown to the apartment property manager who then made the comment to Eric.

Dave

**From:** Dave   ·   mailto:dave@rudras.us]
**Sent:** Friday, - .   2013 4:16 PM
**To:** 'Sonia Ar  .   ave Rudra'
**Cc:** 'Al.cia Sa  :   jshlackman@comcast.net; w.washington221@gmail.com
**Subject:** RE:   Sensitive Evidence needed. Missing Account

Sonia;

This is a question concerning the foreclosure as you can re-confirm. I have been given the file, but my loan is not in the Wells Fargo system. They don't even have the case number on file. So, as far as the other issue, I need your assistance to get to the bottom of this property and its existence. I don't need you to wish me luck, just a shove in the right direction to be able to communicate with Wells Fargo about the foreclosure and status and why cant they find me in the system. Your response is evasive. A simple pointer would work, otherwise they have provided me with the department to correspond with regarding issues of this nature. All I want is to see the status of this account and find out who was corresponding with Wells Fargo regarding my property. Let me know and this will be my last and final request for your assistance regarding the foreclosure issue you have been paid to handle.

Regards
Dave

**From:** Sonia  ·  _  mailto:sonia@samadorlaw.com]
**Sent:** Friday  ..  2013 4:00 PM

2



## AFFIDÁVIT AND SWORN STATEMENT

STATE OF FLORIDA     )
                    ) SS:
COUNTY OF MIAMI-DADE  )

I, the Declarant ___Vivian Nyberg___, DOB ___7/01/1957___,
Identification FI Driver's License No: ___N16R-8000-57-741-R2___, expiration
date: ___7/08/2018___ who is presently employed at ___MAXIM HEALTHCARE___,
___SERVICES___, do hereby certify, swear
or affirm, and declare under penalty of perjury that this is my legal name and
that the following statements are true to the best of my knowledge and that I
can be asked to take a sworn deposition and or be asked to appear in Court to
testify of same.

This is to confirm that on the date of my mediation settlement in the divorce
between myself and Ramesh Nyberg at the offices of my attorney Gregory
Betancourt, I was informed by my attorney that a call from Mary Raymond came in
requesting that Ram keep Linnea away from the Rudras for a period of at least six
months. Ramesh and his attorney objected and would only agree to three months.

My understanding of this language was that I expected that Linnea would
not be around Mandira Rudra and her children. Mary Raymond and I had
previously discussed concerns about Linnea, who became uncharacteristically
withdrawn and expressed strong objections to being in the presence of Mandira
and the kids. The final language agreed in the settlement was to keep Linnea
away from the Rudras for a period of 90 days. This last paragraph " However, this
provision shall be void if Dave Rudra is incarcerated, committed to a mental
institution, moves out of town or dies ", was confusing to me as to why Dave
Rudra was singled out.

Mary Raymond was aware of Linnea's uncharacteristic withdrawn behaviour
and strong objections expressed when she was alone with her daddy and he kept



running into Mandira in public locations such as parks and malls. She did not like the way Mandira was flirting and flaunting herself at her father and competing with the Rudra children for her dad's attention. This started after we met the Rudras. Linnea had many friends at the time, and those friends and families did not trigger the same behaviour that she displayed after being around Mandira and the Rudra children. Within about a month of the settlement I was informed that Ramesh had moved in with Mrs. Rudra and her children. I communicated with Mary Raymond about my surprise of Ram's actions of moving in with Mandira and traveling with them out of state whereby Mary Raymond informed there was little I could do for the courts to intervene within 90 days that Ram had agreed to adhere to because of the time constraints. During the call I thanked her for attempting to put in a six month clause, to which Mary responded that "I think you are thanking me for a different reason".

Signature of Declarant

4 | 06 | 2012
Date:

Vivian Nyberg
Name of Declarant

**IN WITNESS WHEREOF**, the foregoing instrument was, sworn to (or affirmed), subscribed and acknowledged before me this ___6___ day of April, 2012 by: Vivian Nyberg _____ who has produced Florida Drivers License No: N162-860-54-741-0 _____ as identification and did take an oath before a Florida Notary Public.

NOTARY PUBLIC, State of Florida

Rafael Dello Stologo
Notary Printed Name

Notary Public State of Florida
Rafael Dello Strologo
My Commission EE 175581
Expires 03/04/2016

My Commission Expires: 03/04/2016

Commission No. EE 175581

# Federal Violations - Color of Law - Criminal Conspiracy with Intent to Kill
### Title 18 Sections 241, 242, 245, 247, 1512 - Title 42 Sections 1981



**HARVEY RUVIN**
CLERK OF THE COURTS
MIAMI-DADE COUNTY FLORIDA

Criminal Justice - Case List

Last Name: RUDRA   First Name: DEBJIT   Sex: Male

| Case | Filed Date | Closed Date | First Charge |
|------|-----------|-------------|--------------|
| F-13-008456 | 04-16-2013 | 04-30-2014 | ARSON 1ST DEGREE |
| B-11-049972 | 11-19-2011 | 07-27-2012 | PROTECTIVE INJ VIOL |
| B-11-041297 | 08-14-2011 | 11-17-2011 | DISORDERLY CONDUCT |

3 Case(s) Found.

## First Arrest.  In front of Children - NyBerg called 911 in park when picking up Children
Refer to Spencer Email...  Not read Miranda Rights.  Officers ruptured right shoulder rotary cuff!

**Court Case No.: B-11-041297**

| | | |
|---|---|---|
| State Case No.: 13-2011-MM-041297-0001 | Name: RUDRA DEBJIT | Date of Birth: 10-07-1963 |
| Date Filed: 08-14-2011 | Date Closed: 11-17-2011 | |
| Assessment Amount: $0.00 | Balance Due: $0.00 | Stay Due Date: |
| Hearing Date: | Hearing Time: | Hearing Type: |
| Court Room: REGJB JUSTICE BUILDING ROOM No. 2 | | |
| Address: 1351 N.W. 12 ST | | |
| Previous Case | Next Case | |
| Judge: KRIEGER-MARTIN, LUISE | Defense Attorney: WEST SPENCER | |
| Bible Section: M009 | File Location: RECORD CENTER | Box No: 14-19 |

**Charges:**

| Seq No. | Charge | Charge Type | Disposition |
|---------|--------|-------------|-------------|
| 1 | DISORDERLY CONDUCT | MISDEMEANOR | NOLLE PROS COMP PT |
| 2 | RESIST OFF W/O VIOL | MISDEMEANOR | NOLLE PROS COMP PT |

## Second Arrest.   Assigned Cyber Crimes Detective - Filed when sent email complaint
Refer to Antony email... ASA & Baixali gave me option of paying $10,000.00 or 2 years (court)

**Court Case No.: B-11-049972**

| | | |
|---|---|---|
| State Case No.: 13-2011-MM-049972-0001 | Name: RUDRA DEBJIT | Date of Birth: 10-07-1963 |
| Date Filed: 11-19-2011 | Date Closed: 07-27-2012 | |
| Assessment Amount: $40.00 | Balance Due: $0.00 | Stay Due Date: |
| Hearing Date: | Hearing Time: | Hearing Type: |
| Court Room: REGJB JUSTICE BUILDING ROOM No. 4 10 | | |
| Address: 1351 N.W. 12 ST | | |
| Previous Case | Next Case | |
| Judge: SERAPHIN, FRED | Defense Attorney: JIMENEZ ANTONIO | |
| Bible Section: M003 | File Location: RECORD CENTER | Box No: 87-214 |

**Charges:**

| Seq No. | Charge | Charge Type | Disposition |
|---------|--------|-------------|-------------|
| 1 | PROTECTIVE INJ VIOL | MISDEMEANOR | NOLLE PROS |
| 2 | STALKING | MISDEMEANOR | NOLLE PROS |

## Third Arrest.   Sect 242 Failed during set electric explosion.  Falsified Arrest Affidavit
Refer to Arrest Affidavit... Counsel delayed Nolle Process over year for Cyber-Bullying Target

**Court Case No.: F-13-008456**

| | | |
|---|---|---|
| State Case No.: 13-2013-CF-008456-0001 | Name: RUDRA DEBJIT | Date of Birth: 10-07-1963 |
| Date Filed: 04-16-2013 | Date Closed: 04-30-2014 | |
| Assessment Amount: $0.00 | Balance Due: $0.00 | Stay Due Date: |
| Hearing Date: | Hearing Time: | Hearing Type: |
| Court Room: REGJB JUSTICE BUILDING ROOM No. 2 | | |
| Address: 1351 N.W. 12 ST | | |
| Previous Case | Next Case | |
| Judge: COLODNY YVONNE | Defense Attorney: CASAS GRACE | |
| Bible Section: F021 | File Location: SCANNED | Box No. |

**Charges:**

| Seq No. | Charge | Charge Type | Disposition |
|---------|--------|-------------|-------------|
| 1 | ARSON 1ST DEGREE | FELONY | NOLLE PROS |



# Dave Rudra

**From:** edyer140@aol.com
**Sent:** Saturday, February 19, 2011 8:00 PM
**To:** Dave@cicexperience.com
**Subject:** Re: Martinez

Dave,

This is the report of what my personal view of what transpired yesterday:

At approximately 3:45 pm yesterday, February 18th, I met you at the Bank of America branch on US1 and 55th Avenue. When I arrived you were reporting to Officer Koppel of the CGPD how ATM transactions had been found charged to your business account made with the card that your employee Shirley Martinez has. These transactions were made at the Loew's Hotel in Miami Beach, La Carreta Restaurant, Navarro Discount Pharmacy, Chicken Kitchen and numerous other establishments during the last few months. Off. Koppel took down the report and assigned a case number indicating that an Investigator would be assigned to the case and he/she would contact you the following week.

As we were at the bank, you received a text message from Shirley that she was at the office and wanted to know where her paycheck was. You and I left the bank and arrived at your office building, where you entered the Manager's Office to ask about some videotapes. While there, the Manager came out and informed you that Shirley had come to his office asking for a key to your personal office accompanied by 4 men. I suggested that we would not go up alone and called 911 to request an officer to accompany us upstairs. Off. Koppel was dispatched again and as he arrived, he informed us that 3 of the 4 men upstairs were Detectives that had accompanied Shirley to the office.

Upon arrival, we met Det. McKee by the door who in a very hostile manner asked you where Shirley's check was. You told him that payday was not until next Friday. At that time, I mentioned that we had been at the bank reviewing the business bank account because there were transactions made with Shirley's ATM card that she was not authorized to make. At this time, Shirley jumped into view crying indicating that she could not believe that I was there. I asked why they were only hearing her side; Det. McKee and another Det. who you said is named Bauxzly, again in a very hostile manner said that they are very familiar with you and that you do not have a case. Somewhere in there McKee said that the State Attorney's Office has told you that they won't handle anything having to do with your case and that is the entity they have to report to. The 3rd Det. never said anything and the 4th man, according to you, was Shirley's husband.

McKee again asked if you were going to give Shirley a check and you said "No, that payday would be next Friday". You asked the Det. that you needed her keys and ATM card, which Shirley indicated she had left on her desk. As we were walking with them towards the elevator, McKee turned to you first and then to me and said "You are not to contact Shirley by text, phone or emails". She stated that I have been going to her house, which I immediately denied because it is not true. You had 2 addresses for her; 8450 SW 43 Terr and 6455 SW 24th St., Miami. You indicated that you did not know at what address she was presently living and neither did I.

Once they left, we entered the office and I found the card, keys and pass on her desk.

I was somewhat baffled by the fact that the Coral Gables Police Dept. would dispatch 3 Detectives, not even Patrol Officers, to accompany a civilian to her business to pick up her paycheck after she had been fired; it certainly appeared as a waste of Police man hours.

As I indicated, I will next week investigate the charges made at the Loew's Hotel, which were for the higher amounts to see what they were for and needed be, if they have videos, etc.

Should you have any questions, let me know.

Elena Dyer

T-Mobile Print/View Complete Bill



**Your bill as of Aug 05, 2010**

Print    Close Window

**Important Information**
Your past due balance is due
immediately and may be subject to a
late payment charge. Please see page
2 for details. If you have recently
paid this amount, please disregard
this message. Thank you.

**Account Number: 758329249**
DEBJIT RUDRA
1550 MADRUGA AVE STE 411
CORAL GABLES FL 33146-3019

**Summary**

| Item | Amount |
|---|---|
| Previous Balance | 1,124.31 |
| Pmt Rec'd - Thank You | (420.00) |
| **Total Past Due (due immediately)** | **704.31** |
| Monthly Recurring Chgs | 266.48 |
| Usage Charges | 6.99 |
| Other Charges | 13.04 |
| Taxes & Surcharges | 38.94 |
| **Total Current Charges** | **$ 325.45** |
| **Current Charges Due By** | **9/01/10** |
| **Grand Total** | **$ 1,029.76** |

**Monthly Service Summary**
Monthly Service Charges from 7/05/10 - 8/04/10

| Mobile Number | Service Charges | Adjust- ments | Usage Charges | One Time Charges | Other Charges | Taxes & Surcharges | Total Charges |
|---|---|---|---|---|---|---|---|
| Account Charges | 99.99 | - | - | - | - | 17.65 | 117.64 |
| 786-395-3283 | 26.49 | - | - | - | 7.40 | 0.75 | 34.64 |
| 786-553-0405 | 25.00 | - | - | - | 1.41 | 0.75 | 27.16 |
| 786-556-5967 | 30.00 | - | - | - | 1.41 | 6.25 | 37.66 |
| 786-556-6021 | 30.00 | - | - | - | 1.41 | 6.25 | 37.66 |
| 786-953-0199 | 55.00 | - | 6.99 | - | 1.41 | 7.29 | 70.69 |
| **Total Minutes** | **266.48** | **-** | **6.99** | **-** | **13.04** | **38.94** | **325.45** |

| Available Service | | Type | Whenever | Weekend |
|---|---|---|---|---|
| FTEvenMorePlusUnlT+TX | Incl Minutes | Minutes | Unlimited | - |
| | T-Mobile to T-Mobile | Minutes | Unlimited | - |
| | Text Messages | Messages | Unlimited | - |
| | Use Them Or Lose Them | Minutes | - | Unlimited |
| Family Unl Messaging | Picture Messages | Messages | Unlimited | - |

PLEASE DETACH THIS PORTION AND RETURN WITH YOUR PAYMENT PLEASE MAKE SURE ADDRESS SHOWS
THROUGH WINDOW.

Statement For:      **DEBJIT RUDRA**
Account Number:      758329249

T-MOBILE
PO BOX 790047
ST. LOUIS MO 63179-0047

| Amount Due By | Enclosed |
|---|---|
| $1,029.76 | |

To pay this invoice using your credit card - check
box and complete the reverse side

For EasyPay Option - check box and complete the
reverse side

T-Mobile Print/View Complete Bill

Page 3 of 41

## Account Service Detail

**Previous Balance and Payments**

| Item | Amount |
|---|---|
| Previous Balance | 1,124.31 |
| Payment Received On  7/06/10 | (420.00) |

**Service Charges**

| Item | Amount |
|---|---|
| Partial monthly charge for FTEvenMorePlusUnlT+TX from 7/05/10 to 7/05/10 | 3.34 |
| Partial monthly charge for FTEvenMorePlusUnlT+TX from 7/06/10 to 8/04/10 | 96.65 |
| **Service Charges** | **99.99** |

**Taxes, Fees and Surcharges**

| Item | Amount |
|---|---|
| **Government Fees and Taxes** | |
| Federal Universal Service Fund | 2.40 |
| State Communication Service Tax | 9.38 |
| Local Communication Service Tax | 5.87 |
| **Taxes, Fees and Surcharges** | **17.65** |

## Account Service Detail for Subscriber 786-395-3283

| Available Service | Feature | Type | Whenever | | | Weekend |
|---|---|---|---|---|---|---|
| FTEvenMorePlusUnlT+TX | Incl Minutes | Minutes | Unlimited | | | - |
| | T-Mobile to T-Mobile | Minutes | Unlimited | | | - |
| | Text Messages | Messages | Unlimited | | | - |
| | Use Them Or Lose Them | Minutes | - | | | Unlimited |
| Family Unl Messaging | Picture Messages | Messages | Unlimited | | | - |
| Plus BBerry Web | RIM Blackberry | Megabytes | Unlimited | | | - |

| Used Service | Feature | Type | Whenever | Peak | Off Peak | Weekend |
|---|---|---|---|---|---|---|
| | Included Plan Minutes | Minutes | - | 119 | 5 | 5 |
| | Internet Access | Megabytes | 0.0280 | - | - | - |
| | RIM Blackberry | Megabytes | - | 1.4776 | 0.1267 | - |
| | T-Mobile to T-Mobile | Minutes | - | 38 | - | - |
| | Txt Msg Recd | Messages | 19 | - | - | - |
| | Txt Msg Sent | Messages | 16 | - | - | - |

**Monthly Recurring Charges**

| Item | Amount |
|---|---|
| Partial monthly charge for CallerTunes $1.49 from 7/05/10 to 7/05/10 | 0.05 |
| Partial monthly charge for CallerTunes $1.49 from 7/06/10 to 8/04/10 | 1.44 |
| Partial monthly charge for Enhanced Voicemail from 7/05/10 to 7/05/10 | - |
| Partial monthly charge for Enhanced Voicemail from 7/06/10 to 8/04/10 | - |
| Partial monthly charge for Plus BBerry Web from 7/05/10 to 7/05/10 | 0.83 |
| Partial monthly charge for Plus BBerry Web from 7/06/10 to 8/04/10 | 24.17 |
| Partial monthly charge for WorldClass Int'l Rate from 7/05/10 to 7/05/10 | - |
| Partial monthly charge for WorldClass Int'l Rate from 7/06/10 to 8/04/10 | - |
| **Monthly Recurring Charges** | **26.49** |

**Other Charges**

| Item | Amount |
|---|---|
| **Communications Related** | |
| Regulatory Programs Fee* | 1.41 |
| **Non-Communications Related** | |
| PHP Insurance and Warranty by Asurion | 5.99 |
| **Other Charges** | **7.40** |

*Fee we collect and retain to help cover our costs related to funding and complying with government mandates, programs and obligations.

**Taxes, Fees and Surcharges**

| Item | Amount |
|---|---|
| **Government Fees and Taxes** | |
| Federal Universal Service Fund | 0.04 |

T-Mobile Print/View Complete Bill

S-2

| | | | |
|---|---|---|---|
| State Communication Service Tax | | | 0.13 |
| Local Communication Service Tax | | | 0.08 |
| County 911 | | | 0.50 |

**Taxes, Fees and Surcharges**          **0.75**

**Total Charges**          **34.64**

## LOCAL AIRTIME, LONG DISTANCE and INTERNATIONAL CHARGES

| Date | Destination | Time | Number | Call Type | Minutes | Airtime | Toll | Total |
|---|---|---|---|---|---|---|---|---|
| 6/14/10 | Miami, FL | 11:59 AM | 305-790-0051 | | 1 | - | - | - |
| 6/15/10 | Incoming | 2:40 PM | 305-491-1533 | | 1 | - | - | - |
| 6/15/10 | North Dade, FL | 2:52 PM | 305-733-0115 | | 2 | - | - | - |
| 6/15/10 | Incoming | 2:53 PM | 786-253-0852 | (F) | 1 | - | - | - |
| 6/15/10 | Miami, FL | 3:21 PM | 305-491-1533 | | 1 | - | - | - |
| 6/15/10 | Miami, FL | 3:23 PM | 305-444-1565 | | 7 | - | - | - |
| 6/15/10 | Incoming | 3:36 PM | 305-491-1533 | | 6 | - | - | - |
| 6/15/10 | Perrine, FL | 4:34 PM | 786-205-1133 | | 2 | - | - | - |
| 6/15/10 | Incoming | 5:01 PM | 305-934-1509 | | 2 | - | - | - |
| 6/15/10 | Incoming | 5:05 PM | 305-448-0006 | | 4 | - | - | - |
| 6/15/10 | Perrine, FL | 5:41 PM | 786-291-0442 | | 1 | - | - | - |
| 6/15/10 | Incoming | 5:57 PM | 786-291-0442 | | 2 | - | - | - |
| 6/15/10 | Incoming | 6:03 PM | 786-953-0199 | (F) | 1 | - | - | - |
| 6/15/10 | Incoming | 6:07 PM | 954-796-7659 | | 7 | - | - | - |
| 6/15/10 | Coral Spgs, FL | 6:51 PM | 954-796-7659 | | 1 | - | - | - |
| 6/15/10 | Coral Spgs, FL | 6:53 PM | 954-796-7659 | | 2 | - | - | - |
| 6/16/10 | Miami, FL | 1:27 PM | 305-442-1600 | | 1 | - | - | - |
| 6/16/10 | Incoming | 1:28 PM | 305-662-5573 | | 1 | - | - | - |
| 6/17/10 | Incoming | 11:54 AM | 918-392-4635 | | 1 | - | - | - |
| 6/17/10 | Incoming | 12:07 PM | 305-670-3830 | | 1 | - | - | - |
| 6/17/10 | Miami, FL | 12:09 PM | 786-554-7852 | (F) | 3 | - | - | - |
| 6/17/10 | Incoming | 12:28 PM | 786-624-9464 | (F) | 3 | - | - | - |
| 6/17/10 | Incoming | 3:08 PM | 305-491-1533 | | 2 | - | - | - |
| 6/17/10 | Incoming | 3:19 PM | 305-733-0115 | | 2 | - | - | - |
| 6/17/10 | North Dade, FL | 3:27 PM | 305-450-8843 | | 1 | - | - | - |
| 6/17/10 | Miami, FL | 3:54 PM | 305-491-1533 | | 3 | - | - | - |
| 6/17/10 | Incoming | 3:56 PM | 786-953-0199 | (A) | 1 | - | - | - |
| 6/17/10 | Miami, FL | 4:56 PM | 305-669-1113 | | 1 | - | - | - |
| 6/17/10 | Incoming | 4:57 PM | 305-790-0051 | (A) | 1 | - | - | - |
| 6/18/10 | Incoming | 3:23 PM | 305-301-1852 | (F) | 2 | - | - | - |
| 6/18/10 | Incoming | 3:50 PM | 305-790-0051 | | 1 | - | - | - |
| 6/18/10 | Miami, FL | 3:51 PM | 786-624-9464 | (F) | 2 | - | - | - |
| 6/18/10 | Miami, FL | 5:49 PM | 786-624-9464 | (F) | 2 | - | - | - |
| 6/18/10 | Miami, FL | 6:41 PM | 786-367-6635 | | 1 | - | - | - |
| 6/20/10 | Vm Retrieval | 2:58 PM | 123 | (G) | 3 | - | - | - |
| 6/20/10 | Vm Retrieval | 3:00 PM | 123 | (G) | 2 | - | - | - |
| 6/21/10 | Incoming | 12:33 PM | 305-444-1565 | | 2 | - | - | - |
| 6/21/10 | Miami, FL | 4:22 PM | 786-554-7852 | (F) | 3 | - | - | - |
| 7/05/10 | Vm Retrieval | 10:30 AM | 123 | (G) | 3 | - | - | - |
| 7/05/10 | Vm Retrieval | 11:36 AM | 123 | (G) | 1 | - | - | - |
| 7/05/10 | Incoming | 3:18 PM | 515-331-9421 | | 1 | - | - | - |
| 7/05/10 | Miami, FL | 3:37 PM | 786-953-0199 | (F) | 4 | - | - | - |
| 7/05/10 | Miami, FL | 4:29 PM | 786-953-0199 | (F) | 2 | - | - | - |
| 7/06/10 | Cust Care | 8:08 AM | 888-710-4040 | (H) | 1 | - | - | - |
| 7/06/10 | Cust Care | 8:16 AM | 888-710-4040 | (H) | 1 | - | - | - |
| 7/06/10 | Vm Retrieval | 7:11 PM | 123 | (G) | 2 | - | - | - |
| 7/06/10 | Vm Retrieval | 9:30 PM | 123 | (G) | 1 | - | - | - |
| 7/06/10 | Vm Retrieval | 9:30 PM | 123 | (G) | 3 | - | - | - |
| 7/06/10 | Vm Retrieval | 9:33 PM | 123 | (G) | 1 | - | - | - |
| 7/07/10 | Miami, FL | 8:39 AM | 305-790-0051 | | 21 | - | - | - |
| 7/07/10 | Miami, FL | 9:13 AM | 305-858-9550 | | 4 | - | - | - |
| 7/07/10 | Perrine, FL | 10:21 AM | 305-506-5206 | | 2 | - | - | - |
| 7/07/10 | Miami, FL | 12:26 PM | 305-790-0051 | | 2 | - | - | - |
| 7/07/10 | Incoming | 2:48 PM | 305-812-0541 | | 2 | - | - | - |
| 7/07/10 | Incoming | 2:49 PM | 305-790-0051 | (A) | 6 | - | - | - |
| 7/07/10 | Perrine, FL | 3:05 PM | 305-233-5598 | | 2 | - | - | - |
| 7/07/10 | Miami, FL | 3:15 PM | 786-367-6635 | | 3 | - | - | - |
| 7/07/10 | Vm Retrieval | 4:47 PM | 123 | (G) | 2 | - | - | - |
| 7/07/10 | Miami, FL | 4:52 PM | 786-299-7594 | | 5 | - | - | - |
| 7/07/10 | Incoming | 5:23 PM | 305-200-2598 | | 1 | - | - | - |
| 7/07/10 | Miami, FL | 5:52 PM | 786-953-0199 | (F) | 7 | - | - | - |
| 7/07/10 | Incoming | 6:04 PM | 305-670-3830 | | 5 | - | - | - |

1/15/11   Bank of America | Online Banking | Accounts | Account Details | Account Acti…

Sign Off

Locations  Map  Help  En Español
Enter keyword...

**Account Details**

**Business Economy Chk - 9948**   Account: Select Account

⚠️ There was a problem processing your request.
• A hold has been placed on your entire account balance. For assistance, please contact customer service.

**Balance Summary**   **Account Activity**   My Statements   Find Transactions

**$0.00 Available Balance** as of today

Account balance history
Tips to help avoid fees

Go to:  Today (Nov 15, 2011)   Newest · Next · Previous · Oldest   Quick Links

**Amount**

**Check Card Fee Waiver**

To waive your account maintenance fees for this period, use your check card at least once.
View only check card transactions

**Account Numbers**
Show account number
Show routing numbers
View/Edit Overdraft Protection
Not linked for Overdraft Protection
Link your accounts for Overdraft Protection

Turn off Popup Help

**QUICK TIP** Now see your cleared checks with your online statement.
Learn more

**Business Tools**

Small Business Online Community

**Pay Your Bills**
Schedule a payment with Bill Pay
Pay a bill due today with Quick Payment
Learn about your payment options

**Customer Service**
View/Edit Paperless Settings
Manage alerts
Check card settings
Show me more services...

| Date ▾ | Description | Type | Status ▾ | Amount |
|---|---|---|---|---|
| Processing | CHECKCARD ATT*BILL PAYMENT 800-288-2020 ON 11/11 | | | -$1.51 |
| Processing | ACH HOLD JOHN HANCOCK LIF VARANNUITY ON 11/15 | | | -$50.00 |
| Processing | ACH HOLD JOHN HANCOCK LIF VARANNUITY ON 11/15 | | | -$50.00 |
| Processing | CHECKCARD 11/15 WEB PAY-COURT-TICKET MIAMI FL | | | -$51.00 |
| Processing | CHECKCARD RED LOBSTER MIAMI FL ON 11/14 Amount may change - waiting for final amount from merchant | | | $69.38 |
| Processing | ACH HOLD JHUSA PAYMENTS ON 11/15 | | | -$200.00 |
| Hold | BALANCE HOLD | | | -$17,880.18 |
| ▶ 11/14/2011 | Check 1168: Edit Details | | | -$9.00 |
| ▶ 11/14/2011 | CHECKCARD 1110 SPORTS GRILL SOUTH MIAM CORAL GABLES FL 24733091315207099500609 | | | -$17.37 |
| ▶ 11/14/2011 | PUBLIX SUPER M 11/11 #000865036 PURCHASE PUBLIX SUPER MAR CORAL GABLES FL | | | -$22.31 |
| ▶ 11/14/2011 | CHECKCARD 1112 CRAIGSLIST.ORG 415-566-6394 CA 24493981316026386888787 | | | -$25.00 |
| ▶ 11/14/2011 | CHECKCARD 1112 CRAIGSLIST.ORG 415-566-6394 CA 24493981316026386935075 | | | -$25.00 |
| ▶ 11/14/2011 | CHECKCARD 1109 DENNY'S #8698 CORAL GABLES FL 24427331314710005481451 | | | -$27.99 |
| ▶ 11/14/2011 | CHECKCARD 1109 BLUE SKY MARKET PLACE 1 MIAMI FL 24431861314980015452111 | | | -$28.48 |
| ▶ 11/14/2011 | Check 176: Edit Details | | | -$72.00 |
| ▶ 11/14/2011 | Check 1184: Edit Details | | | -$85.00 |
| ▶ 11/14/2011 | Check 151: Edit Details | | | -$150.00 |
| ▶ 11/14/2011 | Check 1179: Edit Details | | | -$195.00 |
| ▶ 11/14/2011 | CHECKCARD 1112 ATT*BILL PAYMENT 800-288-2020 TX 24692161316000121091294 | | | -$337.08 |
| ▶ 11/14/2011 | Check 141: Edit Details | | | -$337.50 |

# GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE AND OCCURANCES

STATE OF FLORIDA

COUNTY OF MIAMI-DADE



PERSONALLY appeared before me, the undersigned authority in and said county and state,

$ANGELA$ $COMMISSIONG$, who having been being first duty sworn by the undersigned Notary Public, deposes and says:

Affiant is informed in the area of such information presented hereby presents a sound analysis and in good faith, states the following:

I have been working as a manager for Clean Image since 1999 and have known that every single one of the people Dave hired to do payroll, ended up stealing company money, by payroll employees. The first person's name was Gabriela something. She was a very rude person, and she was caught paying employees who were terminated and was then fired within three months. Dave tried to do an investigation, but he told us that the police would not investigate her.

The Second person we were shocked to find stealing money through payroll was Marissa Marino. We trusted Marissa Marino and she was well liked, but when she went on Maternity leave in 2009, Shirley Martinez was a new employee and when she was doing payroll, she found that Marissa was paying employees who did not work for us. Later in a meeting, Shirley and Dave found that she had paid out over $85,000.00 dollars to people who did not work for us.

The most disappointing thing was we then had Shirley doing Marissa's job because when she told us about Marissa's theft, Dave said he trusted her. Shirley quit at the end of 2009. Last year when Dave started his divorce, a lot people were hired and fired in the office because the office started having computer problems and the office people were not listening to Dave and then when they quit, they would threaten Dave and Tatiana even filed a Domestic Violence Petition on Dave because fired her for doing things she was not hired for. From that point on, Dave was very frustrated because he kept on getting harassed and having computer viruses and the police did not help. We began losing a lot of contracts when they were here.

Shirley came back last year and Dave gave her the payroll job. We all began to trust Shirley and Dave started to feel comfortable again. In November, Shirley started telling me she wanted to quit because she was so stressed that Dave suspected her of giving information to his wife, Mandira about the divorce and she cried to me telling me that she was scared the police were also putting a lot pressure on her. I talked to Dave about this for her and Dave said, he knew she was passing information to his wife, but did not accuse her. He only wanted to know what was really going on.

*If additional space is needed refer to attachment as Part II of Affidavit.

# GENERAL AFFIDAVIT STATING FACTS ON INFORMATION, FACTUAL EVIDENCE AND OCCURANCES

I know Dave trusted her and I liked her a lot too so I was upset at Dave. Then, in February Dave told us in a meeting that he found out that Shirley was also doing payroll fraud and also using the company card to buy things that were not for the company. I could tell Dave was very sad and shocked to learn this as he thought he could trust her more than everyone and she also seemed like she really cared for Dave and the company. The next Monday, Dave said she had filed a Domestic Violence stalking charge on him.

After she quit I visited her at her house to try and talk to her and find out why she did it. She told me that she was forced to do it by some people and she was afraid of them. She said that there were police and lawyers out to get Dave, and she really needed her last paycheck. I believed her and came to Dave to take her last paycheck to her. When I met her to give it to her, she was very happy and said she wished that he could finish his Divorce soon because Dave's wife Mandira was calling her and she was scared. She told me to tell Dave to take the pictures of her down from FaceBook because it was getting her into trouble with his wife. She said she really cared about Dave and she knew that Dave cared about her a lot.

I spoke to her again after that and Dave gave me more money to help her because he was worried about her. Shirley then told me that, the police told her to set Dave up and have him meet him to violate the restraining order but she did not agree to set Dave up. She also told me that Dave's attorney Spencer kept on texting her and asking her how much she wanted to settle the sexual harassment lawsuit. She told him she wanted $10,000.00 dollars and she said Spencer told her that his client did not have that much money. She told me that "they" were pressuring her to sue Dave for sexual harassment and she did not want to. She said she needed money to go to Cuba to see her dying grandmother and if Dave agreed to give her $5000.00 dollars, she would be able to leave and not have to go to court and press charges against Dave. She also said that the other fired employees, Tatiana, Crystal and Melissa would all go to court to testify against Dave.

I came and told Dave, but Dave was disappointed in her asking for the Money and said he would not do that. I then went to the hearing with Dave and no one showed up.

*Angela Ca* *Angela Commission* (Affiant) 0525-001-43-849-0

SWORN to and subscribed before me, on this __7__ day of __JUNE__ , 20 _11_ .

NOTARY PUBLIC-STATE OF FLORIDA
Maria De La Cruz
Commission # DD799965
Expires: JUNE 23, 2012
BONDED THRU ATLANTIC BONDING CO., INC.

NOTARY PUBLIC

My Commission Expires:_____

*If additional space is needed refer to attachment as Part II of Affidavit.



## JED SHLACKMAN, LMHC
*12965 SW 112 Ave., Miami FL   33176*
*(305) 259-0013*

### CASE REVIEW & PROGRESS UPDATE

Name: Mr. Debjit Rudra
Gender: Male
Date of Birth: 10/07/1963
Date of Review: May 15, 2013

#### Introduction:

In April of 2012 Mr. Rudra contacted this therapist seeking an evaluation and therapeutic
assistance for himself in his dealing with a stressful situation involving divorce and custody
issues. He initiated therapy and has been receiving ongoing counseling through the time of this
review. This report contains the therapist's observations based upon the therapist's clinical work
with Mr. Debjit (Dave) Rudra providing ongoing therapy sessions since April 2012. Due to the
complex nature of this case and legal issues involving this client there has been a review of client
legal documents, forensic reports, and email correspondences to assist in understanding the
client's functioning and psychosocial stressors.

#### Clinical Impressions:

Mr. Rudra has been able to reduce his hypervigilance to some extent, and has been more open in
disclosing a full history of personal issues and past and current victimization. His psychological
state has been frequently challenged by ongoing harassment and sabotage he believes are
associated with his now ex-wife, her boyfriend, and their associates. His ex-wife's boyfriend is a
retired veteran homicide detective who has worked closely in the past with individuals in the
State Attorney's office and local law enforcement, and when his affair with Mr. Rudra's wife was
exposed he and his girlfriend (Mandira) began a campaign of defamation and psychological
warfare to discredit Mr. Rudra and Mrs. Nyberg and obstruct any investigation into Mr. Rudra's
reports of being a crime victim. Those actions led to Mr. Rudra being separated from his
children, losing friends, having his profitable business driven into debt, and facing arrests and
legal charges based on false pretenses, including most recently being accused of arson in a fire
where he was the chief victim, having most of his personal and business possessions lost in a fire
that destroyed his home and traumatized him. Mr. Rudra's hypervigilant tendencies and his
communications where he expresses suspicion and/or frustration are typical reactions of
someone who has been victimized and betrayed and finds it difficult to trust others. While his
fears and distrust are sometimes excessive and inappropriate to a situation, they are based upon
real experiences of victimization and persecution, and the natural instinct is to go into a
hypervigilant mode to protect oneself from further assault or betrayal.

Mr. Rudra's ex-wife Mandira has failed to comply with child visitations indicated in the divorce
settlement and he has not been allowed by her to communicate or visit his children for over a

year. She has also made false accusations that he failed to send child support payments, another method of harassment which has accompanied her ongoing campaign of false accusations against him. Since 2010 he has received taunting and hostile communications [some of which have been seen or heard by this therapist and others] that appear to come from his wife and her boyfriend, and been subjected to multiple frivolous lawsuits, illicit surveillance of his communications, theft from and sabotage of the company he manages, and most recently on February 24th, 2013, a suspicious fire that burned down his home and destroyed his personal and business property as well as records and evidence he had pertaining to his divorce case appeal as well as to the company and to crimes he had alleged were carried out against him and the company. Later, in the middle of April 2013, Mr. Rudra was subjected to an arrest for allegedly having committed the arson, an arrest that involved an intimidating show of excessive police presence and a violation of his rights when he was held for a couple of additional days after making bail and not allowed to exercise rights that are available to those who are incarcerated. The arrest report included a claim by the wife's ex-boyfriend, Mr. Ramesh Nyberg, that Mr. Rudra had threatened arson in an email, yet the email quote was taken out of context and was actually a response by Mr. Rudra to what he perceived as threats coming from Mr. Nyberg and his associates, where Mr. Rudra believed they might be planning to harm him or his property and he was daring them to do so, in the hope that they would refrain from carrying out such actions if he showed them he was aware of their plans.

What appear to be ongoing attempts to incite or entrap him have been occurring since the time of his separation from his wife in 2010, and over the past year he has remained relatively stable and able to cope effectively considering the circumstances: he has been reducing written email messages aimed at expressing anger and accusations toward his perceived attackers and has avoided seeking unhealthy escape from emotional stress, instead focusing more on exercise, spirituality, and personal development. Although traumatized by the fire which destroyed his home and most of his possessions while physically causing a minor burn, he was able to quickly settle into a new residence and resume business operations. He experienced some setback after the arrest and apparent false imprisonment, as facing ongoing injustice and rights violations is quite daunting and disheartening. When faced with extreme stress or loss, many people have difficulty coping and functioning normally; Mr. Rudra has kept focused on self-improvement and has been able to improve his ability to process his feelings and frustrations in constructive ways, although he is human and vulnerable to further difficulties and decompensation if he is continually harassed, mistreated, and denied justice.

### Diagnosis:

Axis I:    309.9 Adjustment Disorder
Axis II:   v. 71.09 - No Diagnosis
Axis III:  Hypertension, High Cholesterol
Axis IV: Contentious divorce and child custody ongoing separation from children, sabotage of business, home burned down, legal issues, subjected to ongoing harassment and rights violations
Axis V:   GAF ~ 70 (current)

### Recommendations:

In therapy it is necessary to continue to counsel Mr. Rudra to avoid generalizing his vigilance and suspicion triggered by the traumatic experiences he has been through. It is also important to help him maintain efforts to separate facts from conjecture and avoid jumping to conclusions. Undue expression of suspicion could make him appear psychologically unstable to those who are unfamiliar with his experience of trauma and victimization. While he has maintained positive coping behaviors, without proper support and an opportunity to get beyond the situation in which he is subjected to ongoing harassment, he could still be at risk for post-traumatic stress syndrome. It is important that Mr. Rudra develop new positive social connections to help rebuild his trust in others. It is also important for him to be able to rebuild his connection with his children, who have likely been alienated from him due to the combination of being separated from him for a long period of time and being influenced by their mother and her accomplices to have a negative view of their father – alienation which they did not exhibit when the marriage was intact.

Through the present time the focus in therapy has been on helping Mr. Rudra build and maintain positive habits and release frustrations and resentments that have been created by the traumas and injustices he has experienced. It is recommended that Mr. Rudra continue to receive therapeutic support on an as-needed basis and have access to genuine legal representation and uncompromised justice system resources to protect his rights and properly investigate the multiple troublesome matters that have occurred since the time Mr. Rudra discovered that his wife was having an affair with a retired police detective who had once been given a job by Mr. Rudra at the company Mr. Rudra managed.

In regards to the minor children and custody and visitation issues, it is recommended that a thorough and unbiased evaluation of the children and both parents be completed, and therapy and supervision be provided as needed to promote healthy relationships between the children and parents and assist in repairing/healing any past harm, deceptions, or misunderstandings. Continued obstruction of contact between the children and father can only contribute to further harm. As of the time of this report the children's mother has obstructed any contact, including written or verbal communication, between Mr. Rudra and his minor children since April of 2012. Mr. Rudra is presently greatly concerned that his ex-wife is planning to kidnap the children and flee to India, as he had been told by Mr. Nyberg's ex-wife in 2010 that his wife and Mr. Nyberg were planning to do this and he has now received confirmation in May 2013 from the U.S. Department of State Child Abduction Prevention Branch that his ex-wife recently applied for passports for the children.

*[signature]*

Jed Shlackman, M.S. Ed., LMHC (FL # MH 5806)



**GENESIS**
BUSINESS SOLUTIONS

*Legal Extortion Invoices Request*

January 18, 2012

Spencer West
Terra Bank Building
3191 Coral Way, Suite 504
Coral Gables, Florida 33145

Via certified mail:  7011 1150 0001 9464 7261

Dear Spencer West;

Upon review of almost two years of representation on this divorce and tangent matters, I am enclosing an account summary of all legal, and psychological expenses, and additionally the fees paid to you through a combination of divorce related matters and Clean Image. This letter is not intended to criticize or show disregard for the efforts on your behalf and the exceptional availability on the phone. I thank you and commend you for being the only counsel to have made forward progress in this matter. Yet I strongly feel that we have room for efficiency and better results.

I would like to make a suggestion and productive request going forward. With trial around the corner, I am concerned that other costs may be incurred and we have not accomplished the objectives for the fees paid. I do not have a proper agreement in regards to the divorce or the Martinez Case which addresses objectives and expectations. Additionally, I do not have any reconciliation for any invoices paid or retainers in place. We have verbal arrangements and expectations. I feel that a lot of emails and correspondences would diminish once we place a strategy, goal and objectives in a formal agreement and those objectives are achieved in a timely manner. This would eliminate the reminder emails and keep things more productive. It would also be in my best interest so that we are in compliance with all court orders and expectations.

By this I am requesting for you to formalize an agreement for the services to be expected and an account summary of past billing, so I may manage my future costs and expenses? I also want to take advantage of the psychological expenses I have incurred in trying to overcome a very planned and Nasty Divorce. I would need to project and manage all completing expenses accordingly by accounting for what was already promised in the retainers and avoid duplicate payment. It will also serve to obtain our goals and objectives in advance with limited time left for trial. Finances are exhausted and with the loss of uncollectable funds in the garnishment, it will not be possible to proceed without organization and accountability.

Regards

Dave Rudra

9/19/2012
Accrual Basis

**Clean Image of Miami**
**DivorceLegal**
**Account Expenses**
**January 1, 2010 through January 19, 2012**

N-1

## PROFESSIONAL FEES - LEGAL EXPENSE

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Check | 01/05/2010 | 10979 | Pollack & Rosen | Divorce | SunTrust | 2,000.00 | 2,000.00 |
| Check | 01/11/2010 | 6086 | Pollack & Rosen | Divorce | SunTrust | 2,829.35 | 4,829.35 |
| Check | 02/17/2010 | 6090 | Palms Law Firm | Legal | SunTrust | 3,000.00 | 7,829.35 |
| Check | 02/02/2010 | 547 | Pollack & Rosen | Attorney Fees/Divorce | SunTrust | 49.00 | 7,878.35 |
| Check | 03/02/2010 | 5846 | Pollack & Rosen | Attorney Fees/Divorce | SunTrust | 1,500.00 | 9,378.35 |
| Check | 03/02/2010 | 10934 | Robbins Equine | Attorney Fees/Divorce | SunTrust | 3,628.27 | 13,000.62 |
| Check | 03/02/2010 | CC-3/ | Robbins Law | Legal | SunTrust | 4,273.72 | 17,280.34 |
| Check | 03/15/2010 | 951 | Robbins Law | Legal | SunTrust | 3,228.27 | 13,000.62 |
| General Journal | 04/12/2010 | 20559 | Pollack & Rosen | Divorce | SunTrust | 10,000.00 | 7,790.28 |
| Check | 04/15/2010 | 20567 | Pollack & Rosen | Divorce | SunTrust | 7,790.28 | |
| General Journal | 04/19/2010 | 20526 | Pollack & Rosen | Divorce | SunTrust | 5,000.00 | |
| General Journal | 04/30/2010 | 20528 | Cash | Per Request Cash Payment - Jose Gallego | SunTrust | 1,000.00 | |
| Check | 07/20/2010 | | Jose Gallego PA | FL TNL Cash Withdrawal from Chk 5577 Banking Ctr Brd Road fl 0001585 FL | SunTrust | 2,985.00 | |
| Check | 08/03/2010 | | Jose Gallego PA | Cash | SunTrust | 500.00 | |
| Check | 08/03/2010 | | Jose Gallego PA | CHECKCARD 0805 JOSE E GALLEGO PA | SunTrust | 300.00 | |
| Check | 08/09/2010 | | Jose Gallego PA | CHECKCARD 0805 JOSE E GALLEGO PA | SunTrust | 750.00 | |
| Check | 08/09/2010 | | Jose Gallego PA | CHECKCARD 0812 JOSE E GALLEGO PA | SunTrust | 2,500.00 | |
| Check | 08/16/2010 | 20077 | Antonio Jimenez PA | Divorce/Legal | SunTrust | 1,700.00 | |
| Check | 08/17/2010 | 20082 | Jose Gallego PA | Divorce/Legal | SunTrust | 3,500.00 | |
| Check | 08/20/2010 | | Jose Gallego PA | CHECKCARD 0826 Sutton Law Group | SunTrust | 2,500.00 | |
| Check | 08/20/2010 | | Sutton Law Group | Legal | SunTrust | 4,000.00 | |
| Check | 08/31/2010 | 20152 | Jose Gallego PA | Divorce/Legal | SunTrust | 2,500.00 | |
| Check | 09/08/2010 | | Jose Gallego PA | Legal | SunTrust | 8,500.00 | |
| Check | 09/08/2010 | 20160 | Brad Belo | Per Request Cash Payment - Jose Gallego | SunTrust | 1,500.00 | |
| Check | 08/24/2010 | | Withdrawal | Legal | SunTrust | 2,000.00 | |
| Check | 08/24/2010 | | John Sutton | Per Request Cash Payment - Jose Gallego | SunTrust | 12,750.00 | |
| Check | 09/08/2010 | 20212 | Spencer West | Legal | SunTrust | 3,000.00 | |
| Check | 10/19/2010 | 20232 | Spencer West | | Checking at Bank of America-St | 1,500.00 | |
| Check | 11/26/2010 | | Sutton Law Group | CHECKCARD 0311 SUTTON LAW GROUP PA SOUTH MIAMI FL 2417175016171202772 | Checking at Bank of America-St | 2,000.00 | |
| Check | 01/18/2011 | | Sutton Law Group | CHECKCARD 0425 MITCHELL AND WEST, LLC CORAL GABLES FL 2407105115587 | Checking at Bank of America-St | 500.00 | |
| Check | 03/16/2010 | 20307 | Spencer West | | Checking at Bank of America-St | 2,000.00 | |
| Check | 04/20/2011 | | Jonathan Meitz PA | BRICKELL SETTLEMENT | Checking at Bank of America-St | 530.00 | |
| Check | 05/12/2011 | | Jonathan Meitz PA | CHECKCARD 0603 JONATHAN MELTZ PA MIAMI FL 244928017154118000103341 | Checking at Bank of America-St | 750.00 | |
| Check | 06/02/2011 | | Spencer West | CHECKCARD 0623 JONATHAN MELTZ PA MIAMI FL 244928017174118000103445 | Checking at Bank of America-St | 524.25 | |
| Check | 06/02/2011 | 20349 | PJ Mitchell | CHECKCARD 0624 MITCHELL AND WEST, LLC CORAL GABLES FL 2407105117596714 | Checking at Bank of America-St | 15.00 | |
| Check | 06/24/2011 | | Jonathan Meitz PA | CHECKCARD 0718 LAW OFFICES OF SONIA A MIAMI FL 243230012302251990100019 | Checking at Bank of America-St | 500.00 | |
| Check | 07/14/2011 | | Law Offices Of Sonia Y A  PA | CHECKCARD 0728 LAW OFFICES OF SONIA A 305-403-1750 FL 2432300122952520701 | Checking at Bank of America-St | 250.00 | |
| Check | 07/19/2011 | | Law Offices Of Sonia Y A  PA | Invoice No. 946577 | Checking at Bank of America | 500.00 | |
| Check | 07/27/2011 | 1001 | U.S. Legal Support, Inc. | Invoice No. 946577 | Checking at Bank of America | 1,000.00 | |
| Check | | 2055 | U.S. Legal Support, Inc. | Legal | Checking at Bank of America | 1,500.00 | |
| Check | | 2054 | Spencer West | CHECKCARD 0812 JONATHAN MELTZ PA 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 FL 2424310612252007319560024 | Checking at Bank of America | 5,000.00 | |
| Check | | 2035 | Jonathan Meitz PA | CHECKCARD 0818 JONATHAN MELTZ PA MIAMI FL 24493061331330701570000024 | Checking at Bank of America | 500.00 | |
| Check | | 20388 | Law Offices Of Theodora Green | CHECKCARD 0820 LAW OFFICES OF SONIA A 305-403-1750 FL 2432300126425 | Checking at Bank of America | 83.00 | |
| Check | 09/05/2011 | | Jonathan Meitz PA | CHECKCARD 0831 JONATHAN MELTZ PA MIAMI FL 2443106124420713600029 | Checking(2) at Bank of America | 9,300.00 | |
| Check | 09/12/2011 | | Spencer West | CHECKCARD 0902 MITCHELL AND WEST, LLC CORAL GABLES FL 2407105124596712 | Checking(2) at Bank of America | | |
| Check | 08/15/2011 | 1053 | Inc Corporate Fees Genesis | | Checking(2) at Bank of America | | |
| Check | 08/09/2011 | 1097 | Legal Genesis | | Checking(2) at Bank of America | | |
| Check | 09/01/2011 | | Spencer West | Divorce Legal | Checking(2) at Bank of America | | |
| Check | 09/20/2011 | 1184 | US Legal Support, Inc. | | Checking(2) at Bank of America | | |
| Check | 10/06/2011 | 985 | SPENCER WEST | | BANK OF AMERICA - CHECKING 426 | | |
| | | | | | | **125,210.12** | **125,210.12** |
| Check | 11/21/2011 | | Just Answer/Expert | CHECKCARD 0816 JUSTANSWER "LAWYERS "EXPERTS | Checking at Bank of America-Sb | 65.00 | 65.00 |
| Check | 11/14/2011 | | Just Answer/Expert | CHECKCARD 0819 JUSTANSWER "EXPERTS | Checking at Bank of America-St | 20.00 | 85.00 |
| Check | 12/06/2011 | 20156 | Elena Dyer | Divorce/Legal | Checking at Bank of America-St | 1,500.00 | 1,585.00 |
| Check | | | Just Answer/Expert | CHECKCARD 1130 JUSTANSWER "LAWYERS | Checking at Bank of America-St | 68.00 | 1,653.00 |
| Check | | | Just Answer/Expert | CHECKCARD 1210 JUSTANSWER "LAWYERS | Checking at Bank of America-St | 58.00 | 1,611.00 |
| Check | | | Just Answer/Expert | CHECKCARD 1213 JUSTANSWER "LAWYERS | Checking at Bank of America-St | 58.00 | 1,769.00 |
| Check | | | | CHECKCARD 0111 JUSTANSWER "LAWYERS 888-587-8220 CA 2489276101110034417 | Checking at Bank of America-St | 58.00 | 1,827.00 |
| Check | 02/15/2011 | 20242 | Dyer PI | Jan 11 Invoice (Check Returned) | Checking at Bank of America-St | 2,000.00 | 3,827.00 |
| Check | 02/08/2011 | 20242 | Dyer PI | Jan 11 Invoice | Checking at Bank of America-St | 2,000.00 | 5,827.00 |
| Check | 03/18/2011 | | | CHECKCARD 0205 JUSTANSWER "LAWYERS 888-587-8220 CA 2468291070020562 | Checking at Bank of America-St | 58.00 | 5,887.00 |
| Check | 03/16/2011 | | | CHECKCARD 0317 JUSTANSWER "LAWYERS 888-587-8220 CA 2468291070000726 | Checking at Bank of America-St | 43.00 | 5,544.00 |
| Check | 04/01/2011 | 20275 | Elena Dyer PI | | Checking at Bank of America-St | 500.00 | 5,946.00 |
| Check | | | | CHECKCARD 0330 A ALLIANCE FOR PSYCHOLO MIAMI FL 2448913109099000239511 | Checking at Bank of America-St | 1,200.00 | 7,645.00 |

01/16/2011
Accrual Basis

**Chase Image Of Miami**
**DivorceLegal**
**Account Expense**
**January 1, 2011 through January 15, 2012**

N-2

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|
| Check | 02/27/2011 | 10077 | J. Michael Bone, Ph.D. | CHECKCARD 0224 J MICHAEL BONE PHD PA WINTER PARK FL 24707601177800002 | Checking at Bank of America-St | 150.00 | 7,785.00 |
| Check | 02/26/2011 | 20081 | J. Michael Bone, Ph.D. | | Checking at Bank of America-St | 2,500.00 | 10,285.00 |
| Check | 05/03/2011 | 2089 | Dr. Michael Bone | | Checking at Bank of America-St | 1,500.00 | 11,785.00 |
| Check | 05/12/2011 | 1051 | Dr. Michael Bone | | Checking(2) at Bank of America | 2,000.00 | 13,785.00 |
| Check | 05/14/2011 | 1051 | Paul Raghunandan | | Checking(2) at Bank of America | 330.00 | 14,115.00 |
| Check | 05/18/2011 | 1055 | Paul Raghunandan | Invoice No. 19502 | Checking(2) at Bank of America | 720.00 | 14,835.00 |
| Check | 12/01/2011 | 1040 | Mike De Carlo | | Checking at Bank of America-St | 1,000.00 | 15,835.00 |
| Check | 12/05/2011 | | DR SILVERMAN | CHECKCARD 1201 PROFCHARGE 816-2062126 CA 2407105133568711 | Checking at Bank of America-St | 2,000.00 | 17,835.00 |
| Check | 12/12/2011 | | DR SILVERMAN | CHECKCARD 1209 PROFCHARGE 816-2062126 CA 2407105136368711 | Checking at Bank of America-St | 2,000.00 | 20,835.00 |
| | | | | | | | 20,835.00 |
| Check | 01/07/2010 | CC 1/7 | Clerk of Courts | Legal | SunTrust | 135.00 | 135.00 |
| Check | 05/05/2010 | PC 3/5 | Thomas Investapiece | | SunTrust | 365.00 | 500.00 |
| Check | 01/04/2011 | | ICE LEGAL PA | ICE LEGAL PA... DES:9066098503 ID: INON,C INC CO ID:M8 E | Checking at Bank of America-St | 365.00 | 945.00 |
| Check | 01/07/2011 | | ICE LEGAL PA | CHECKCARD 0106 NATIONAL REPORTING SERV 305-3737265 FL 2471705100316006272 | Checking at Bank of America-St | 95.00 | 945.00 |
| Check | 02/02/2011 | | ICE LEGAL PA | ICE LEGAL PA... DES:9066098503 ID: INONC INC CO ID:M8 E | Checking at Bank of America-St | 350.00 | 1,295.00 |
| Check | 03/02/2011 | | ICE LEGAL PA | ICE LEGAL PA... DES:9066098503 ID: INONC INC CO ID:M8 E | Checking at Bank of America-St | 350.00 | 1,645.00 |
| Check | 04/05/2011 | | ICE LEGAL PA | DES:9066098503 ID: INONC INC CO ID:M8 E | Checking at Bank of America-St | 350.00 | 1,995.00 |
| Check | 04/02/2011 | 10021 | Equitas Deposition Solutions | DES:9066098503 ID: INONC INC CO ID:M8 E | Checking at Bank of America-St | 350.00 | 2,345.00 |
| Check | 05/03/2011 | | ICE LEGAL PA | DES:9066098503 ID: INON,CLEAN IMAGE OF MIAMI CO ID:M8 E | Checking at Bank of America-St | 350.00 | 2,695.00 |
| Check | 05/02/2011 | | ICE LEGAL PA | DES:9066098503 ID: INON,CLEAN IMAGE OF MIAMI CO ID:M8 E | Checking at Bank of America-St | 350.00 | 3,045.00 |
| Check | 07/05/2011 | | ICE LEGAL PA | DES:9066098503 ID: INON,CLEAN IMAGE OF MIAMI CO ID:M8 E | Checking at Bank of America-St | 348.74 | 3,393.74 |
| Check | 08/02/2011 | | ICE LEGAL PA | DES:9066098503 ID: INON,CLEAN IMAGE OF MIAMI CO ID:M8 E | Checking at Bank of America-St | 180.00 | 3,573.74 |
| Check | 07/07/2011 | | ICE LEGAL PA | DES:9066098503 ID: INON CLEAN IMAGE OF MIAMI CO ID:M8 E | Checking at Bank of America-St | 350.00 | 3,923.74 |
| Check | 07/02/2011 | | ICE LEGAL PA | DES:9066098503 ID: INON CLEAN IMAGE OF MIAMI CO ID:M8 E | Checking at Bank of America-St | 265.00 | 5,338.74 |
| Check | 08/02/2011 | 20240 | Jose H Mejia | Legal - 865003-306 | Checking at Bank of America-St | 180.00 | 5,518.74 |
| Check | 08/05/2011 | 20358 | Jose H Mejia | PI | Checking at Bank of America-St | 107.00 | 5,625.74 |
| Check | 08/12/2011 | 20385 | Maya & Maya | Legal Expense | Checking at Bank of America-St | 300.00 | 5,925.74 |
| Check | 08/30/2011 | 20387 | Maya & Maya | # Service | Checking at Bank of America-St | 47.50 | 5,973.24 |
| Check | 09/26/2011 | 1001 | Ultimate Express Services Corp. | | Checking(2) at Bank of America | 305.00 | 6,273.24 |
| Check | 08/30/2011 | 102 | Miami Dade Clerk of Courts | LEGAL | Checking(2) at Bank of America | 47.50 | 6,320.74 |
| Check | 10/26/2011 | 1188 | Third DCA | Invoice Reference #: SS-26099 | Checking(2) at Bank of America | 271.00 | 6,593.74 |
| Check | 11/01/2011 | 1165 | SUNTRUST BANK | ADVOCATE PROGR 11/01 #00119108 PURCHASE ADVOCATE PROGRAV I MIAMI FL | Checking(2) at Bank of America | 60.00 | 6,653.74 |
| Check | 11/07/2011 | | SUNTRUST BANK | CHECKCARD 1104 PROFESSIONAL PROCESS S FORT LAUDERDAL 2407105131 | Checking(2) at Bank of America | 200.00 | 6,853.74 |
| Check | 11/07/2011 | | | CHECKCARD 1119 WEB B N.Y. COURT TICKET 305-3735861 FL 24755427924733402 | Checking(2) at Bank of America | 419.00 | 7,274.74 |
| Check | 11/21/2011 | | | CHECKCARD SUNSHINE STATE TE BA MIAMI FL | Checking at Bank of America-St | 200.00 | 7,474.74 |
| Check | 12/22/2011 | 5092 | CLERK OF COURTS-DADE | SHIRLEY'S LAWSUIT FILING FEES | BANK ATLANTIC - CHECKING | 7,738.18 | 25,154.92 |
| Check | 11/15/2011 | | | Legal Order Fee LTS U111511001471 | BANK OF AMERICA - CHECKING 9 | 1,790.18 | 26,576.31 |
| Check | 11/15/2011 | | | Legal Order LTS U111511001471 | BANK OF AMERICA - CHECKING 9 | 423.38 | 25,576.31 |
| Check | 11/15/2011 | | | Legal Order LTS U111511001471 | BANK OF AMERICA - CHECKING 9 | 28,576.31 | 25,576.31 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total PROFESSIONAL FEES - LEGAL EXPENSE** | | | | | | **171,621.43** | **171,621.43** |
| **TOTAL** | | | | | | **171,621.43** | **171,621.43** |

# **FIRE** TECHNOLOGY CONSULTANTS L.L.C.



| Main Office | Fredericksburg Office | Maryland Office |
|---|---|---|
| Box 578 | P.O. Box 8472 | PO Box 59667 |
| Fairfax, VA 22038 | Fredericksburg, Virginia 22404 | Potomac, MD 20859 |
| 804-937-8417 | 703-408-8809 | 703-819-9835 |
| Fax: 804-482-2862 | Fax: 703-563-9610 | Fax: 301-576-8628 |

January 20, 2014

Grace M. Casas, Esquire
370 Minorca Avenue, Suite 8
Coral Gables, Florida 33134
Telephone: (305) 975 1938
Facsimile: (877) 853-9415

Dear Ms. Casas:

RE:    Case No. F13-008456, State of Florida v Debjit Rudra

This document was prepared at your request in order to provide a summary of my analysis, opinions, and impressions to-date regarding issues in the aforementioned matter. I have separated the analysis into two sections. The first lists the errors and mistakes of the investigative personnel. The second describes the error and mistakes of the investigative personnel along with supporting documentation of what is recommended and standard fire investigative practices.

I reserve the right to alter or modify my opinions and impressions should additional evidence warrant such.

During the course of a fire investigation, in addition to a physical examination of the fire scene, the investigator routinely produces notes, sketches, and other hand written items in order to document or record the investigation. Interviews are routinely documented by audio recording and by writing down on paper information obtained from those interviews. Accuracy of information provided by witnesses can fade as time goes by unless they are properly recorded. Several of the reports and documents discuss statements provided by the defendant. I find it difficult to believe that the investigators could accurately and with specific detail recall the information provided to them by the defendant.

Handwritten items such as notes and sketches, that are normally created during a fire investigation have not been provided. Those items should have been completed in order to properly document the scene and interviews. I recommend that you request any notes, sketches, or other documents, whether handwritten, drawn or otherwise created at any time before, during, or after the fire that occurred at the defendant's house. I recommend asking in this general manner such as, "all items related to the fire and investigation that have not been requested or that are or were created by investigators or detectives at any point in the investigation in to the fire loss at 10321 SW 140th Street, Miami, FL 33176.

Sincerely,

*B. D. Ciffe*

1

## Errors and mistakes of investigation and findings

### MDFD Lead Investigator Lieutenant Darren Altarac

- ➢ His reports do not contain the foundation on which the opinion and conclusions are based.
  - They rely on limited data that serves their needs, not the needs of investigating the cause of the fire.
- ➢ Altarac's conclusions are flawed because of limited collection and analysis of fire scene data.
  - He only used results of the samples to determine area and cause of the fire. He had nothing else to prove his area of fire origin and the cause.
  - Detective D. Lathrop states in her report that Altarac was waiting for the results of the lab testing BEFORE he made his determination of the fire cause.
- ➢ Altarac's determination is in conflict with the data that there are two areas of fire origin is in conflict with the data from the scene and the laboratory.
- ➢ He improperly states in his report that the living room was cleared in layers when it was done with heavy machinery and not completely in layers.
- ➢ He improperly states in his report that the dining room was cleared in layers when it was done with heavy machinery and not completely in layers.
- ➢ He fails to explain how Rudra's statements are inconsistent with the scene.
- ➢ He states in his report, "The concrete at the exterior, front entrance had heavy spalling (cracked). If he is meaning that the spalling is an indication of an arson fire or indication that an ignitable liquid was used, he has made a serious mistake.
- ➢ Altarac appears to suggest that there was too much fire at the time of arrival and that the fire grew too fast, an indication of an intentionally set fire.

### MDPD Detective Diana Lathrop/Castillo

- ➢ MDPD Detective Diana Lathrop/Castillo states in her initial report that the entire house was burnt, leaving only the exterior wall standing is an inaccurate statement and a distortion of the truth.
- ➢ She states that MDFD had been holding the scene, not that they were extinguishing the fire or watching for hot spots.
- ➢ There were no exigent circumstances.
- ➢ Her report states the Rudra told them that he did not have accelerants in the house. He did not, but he did have a container of gasoline on the front porch.
- ➢ By using the words "detected accelerants," she insinuates that this was a fire that was accelerated by ignitable liquids. They may have suspected accelerants, but only the lab can detect them. NFPA 921 states that accelerants are only suspected until confirmed in a laboratory.
- ➢ She states in the arrest affidavit that she assisted with determining the cause of the fire, but does not articulate it in her report.



2

- ➢ The arrest warrant affidavit contains flaws and inaccuracies. Had she not included inaccurate information, and only told the truth, to get the arrest warrant, perhaps the arrest warrant would not have been issued due to lack of probable cause.
- ➢ She inaccurately states that the first fire suppression unit arrived on the scene 8 minutes after the call was received. The ACTUAL time between the 911 call and the first fire suppression unit arrival on the scene is 9 minutes and 53 seconds after the 911 call. R04 arrived at 23:15:42 hours, 9 minutes and 8 seconds after the 911 call.
- ➢ She finishes her sentence with "…and found the home fully engulfed in flames." Which is not true.
- ➢ She falsely states that investigators found 3 points of origin inside the house when there was only one.

## Investigator Lieutenant Albert Carbonell

- ➢ He states that fire debris was removed in a systematic method from top to bottom and photographed. As discussed earlier, they used heavy equipment on the day BEFORE he arrived on the scene and scraped the living room and dining room.

## Florida State Fire Marshal Alejandro Galen

- ➢ The statement that he makes in his report that a New Holland front-loader entered the house and was used to overhaul/excavate the southwest side of the living room is only partly correct. It was also used in other areas of the house.
- ➢ He states in his report that the remaining parts of the structure were overhauled by manual labor which is not completely true.
- ➢ By using the New Holland Front-loader they contaminated the scene, destroyed potential evidence needed to a proper evaluate the scene and determine the fire cause.
- ➢ There is no documentation of arc mapping either before or after the tractor was used.
- ➢ He misinterprets the fire damage patterns in the small room between the master bedroom and the gym as well as the pattern on the exterior wall.
- ➢ Galen may have improperly used the improper data in the formulation of his conclusion, that samples 2, 4, and 6 had characteristics that are normally found in gasoline, and that the components were too degraded, distorted, and/or weak to make a positive conclusion.
- ➢ His statement about being multiple points of origin is misleading. He only identifies 2 areas where he thinks the fire started, not multiple. While multiple means more than one, may give the connotation of several or many points of fire origin, not 2.
- ➢ The statement he makes in his conclusion, that interior samples tested positive for gasoline, is not accurate and a distortion of the truth. Only one sample from the interior tested positive for gasoline, and that was sample #7.
- ➢ He says that Rudra had the motive, means, and opportunity to burn his house, stating that burned in in part because it was in foreclosure. Many people nowadays have houses in foreclosure. Foreclosure does not mean that he burned his house down. Investigators do not have proof that Rudra had insurance to cover his house or the contents.

## Expectation bias

➢ After the initial assessment by Altarac, investigators approached this incident with a presumption as to origin, ignition sequence, cause, fire spread, or responsibility for the incident, incendiary.

➢ Altarac and the other investigators were suspicious of this fire from the beginning because of what Rudra told them. They state that he provided statements inconsistent with the scene. As such, they began to suspect and presumed that this probably was an arson fire.

➢ Detective D. Lathrop states this in her report that she was asked to respond to the scene because, according to Captain Torres, that the story that Rudra gave investigators did not match the scene.

➢ Lathrop is an arson detective. She was called because the investigators suspected arson.

➢ They had expectation bias and were only looking for evidence of arson instead of the collection of data with which to analyze in order to determine the fire cause.

➢ There is no discussion about examination or inspection of the scene as whole, including the consideration of and analysis of other potential heat sources and how they could be confirmed or eliminated as a possible cause for this fire.

## Improper scene documentation

➢ There do not appear to be any documentation of the scene except the photographs, no handwritten notes, sketches, diagrams, or maps. According to NFPA 921, a critical step.

➢ Investigators have only limited documentation of the fire scene as well as their activities, and their opinions and conclusions CANNOT be verified.

➢ Investigators have no compilation of factual data, only data they collected to prove that this was an arson fire.

➢ Investigators do not document many things, the interior of the building layout, furniture or appliances, the condition or position of the breakers in the breaker box.

➢ There is extensive discussion in the reports of the investigators, many were weeks after the scene examination and/or after those interviews were conducted. The accuracy of their investigation and conclusions come into question if there were no notes, recordings, or other documents created during the course of the scene examination.

➢ No diagrams were provided. They denied having completed any, yet Detectives Galen and Lathrop reports indicate that MDPD and MDFD did a scene sketch.

## Investigators did not follow the scientific method

➢ Investigators have no proof of any fire cause and specifically, no proof that this fire was intentionally set fire.

➢ Altarac determined this was an arson fire only because two of the samples were positive for gasoline.

➢ Investigators did not follow the scientific method and violated many elementary investigative methods of fire scene examination.

➢ They destroyed the scene, preventing the proper identification of potential sources of ignition for this fire.



4

- ➤ They destroyed the scene, preventing any other fire investigator from determining the cause of the fire.
- ➤ They prevented any other reliable examination to be conducted and be able to evaluate potential causes of the fire (spoliation).
- ➤ They did not need to use heavy machinery to remove debris. The debris was not substantial, and there was no safety issue that needed to be corrected.
- ➤ They destroyed the kitchen walls during their investigation and prevented an electrical analysis of items in the kitchen and the kitchen walls.
- ➤ They did not systematically excavate the fire debris from the top down. This should have (and could have) been done by hand. They had many people on scene to do this.
- ➤ There was not an upper floor to fall down onto the main floor that would have created a heavy load of debris on top of the interior of the dining room, living room, and kitchen.
- ➤ Investigators contaminated the scene with machinery and personnel, preventing reliable examination of samples that are suspected of containing ignitable liquids.
- ➤ Investigators did not correctly identify the area or the point of fire origin.
- ➤ Investigators did not use witness statements to assist them in determining where the fire started. Investigators only say that Rudra's statements are not consistent with what they are seeing at the scene. They use this as part of their evidence that the fire is an intentionally set fire.
- ➤ Investigators improperly read fire patterns.
- ➤ All investigators fail to examine and discuss all of the fire effects and patterns in the house to determine fire spread. Only Galen attempts to use them to explain his origin determination.
- ➤ Arc Mapping was not used.
- ➤ The investigators do not utilize the role of fire dynamics in determining the origin or cause of this fire.
- ➤ Investigators incorrectly imply that the fire came through the roof too early in the fire as evidence of an intentionally set fire.
- ➤ They do not discuss any fire dynamics discussion in their fire investigation reports.
- ➤ Altarac did not utilize any evidence to tell them where the fire started, other than the samples coming back positive for gasoline.
- ➤ Fire debris was not removed in a planned and systematic way so as not to destroy fire patterns or evidence that may assist in determining the cause of this fire.
- ➤ There was not sufficient documentation of the scene excavation or the removal of items.
- ➤ There was no reconstruction of the fire scene, recreating the original scene.
- ➤ There was inappropriate use of mechanized excavating equipment.
- ➤ Before using heavy equipment, the scene should be documented in the same manner as in all investigations. This was not done.
- ➤ Documentation should also be conducted at frequent intervals when heavy equipment is being used. This was not done.
- ➤ They drove heavy equipment into the structure BEFORE collecting samples that were sent to the lab.
- ➤ Heavy equipment was not inspected for any leaks of petroleum products prior to use. There is also no documentation or such an inspection.



- ➤ Samples of the equipment fluids were not collected for comparison purposes.
- ➤ Investigators failed to document the electrical system in the house, inspect it, evaluate it, or consider it as a possible cause of the fire.

## No search warrant was obtained to continue their investigation or prior to taking samples.

- ➤ Documentation indicates that no investigator was at loss site on 2-24-13 from 0157 hours – 0752 hours
- ➤ Documentation indicates that no investigator was at loss site from 1351 hours on 2-24-13 until 0715 hours on 2-25-13.
- ➤ They believed that a crime (arson) had been committed before they took samples.
- ➤ On 2-24-13 at 0830 hours, MDPD detective Diana Lathrop was requested to respond by Capt. Torres because the story given by Debjit Rudra did not match.
- ➤ On 2-24-13 at 1030 hours, Diana Lathrop lists arson on the vehicle storage receipts.
- ➤ There were no exigent circumstances. The fire was out.
- ➤ They abandoned their investigation on 2-24-13 and left the scene, twice, once in the morning of the 24th and once in the evening of the 24th. They came back without a warrant, administrative or otherwise, and had no authorization from owner.

## The fire scene was contaminated

- ➤ Investigators allowed the fire scene to be contaminated by heavy machinery, personnel, and equipment prior to collecting samples.
- ➤ The equipment and machinery were not decontaminated before bringing them into the scene.

## Deviations from recommended standards and practices

- ➤ Three of the samples (#2, #3, #4) collected on 2-24-13 were not properly documented. There is no documentation that indicated specifically where these samples were taken, no sketches, no photographs.
- ➤ No control samples were taken.
- ➤ Investigators violated this section because they did not provide sketches to show where they took evidence. They also did not photograph samples 2, 3, and 4. We really don't know where items 2, 3, or 4 were taken.
- ➤ Investigators did not prevent contamination by people, equipment or machinery
- ➤ Investigator failed here because they did not use any of the suggested methods to protect the scene from contamination. Firefighters are seen in the photographs walking around and inside of the structure.
- ➤ Any testimony regarding the dog alerting to an ignitable liquid has not been admissible as an indicator of an ignitable liquid as it can produce false positives. The dog is used to assist find locations to take samples.
- ➤ If investigators claim to follow NFPA 921 standards for evidence collection, then they have to follow ASTM E 1188 and ASTM E 860 by reference. They should be familiar with these.



**Maxcent Consulting**

6800 SW 40 Street #683
Miami, FL 33155

November 28, 2014

Report prepared for Mr. Debjit Rudra (Client/Victim)
16915 SW 94th Ct.
Miami, Florida 33157

### Forensics review, and August 12 analysis follow-up of client Electronic Information Compromises.

*Prepared by Jose A Meneses, CEO and President of **Maxcent Consulting** established in August of 2007. I have a Degree in Computer Programming, certified by Microsoft and Cisco, an (MCSE) Microsoft Certified System Engineer, and Cisco Certified Network Associate.*

### Review:

On August 12, 2014 I submitted my initial analysis of client's home and office network operating systems, historical reports, and ongoing concerns. My assessment was based on reviewing the past four years of client's IT reports as well as evaluating current error logs and complaints. I determined that the type of attacks targeting client are too time involved, aggressive and costly for a random or spammer, but being conducted by someone having personal knowledge and interest in the client, with a specific interest in his emails and browsing history.

In August, I also began a complete re-format and re-installed updated software in each of client's personal and office computers. I conducted a full virus scan of all files and installed (webroot), an anti-virus/spyware on all pc's, and reset firewall to secure settings for maximum security. In September, I installed a new network Server at client's office and assisted client to switch out all potentially compromised ISP modems, changed all passwords and hints to make it impossible for even a personally known hacker to crack. I installed and additional firewall/router layer for protection, disabled all wireless connections. I have since been monitoring client's systems daily.

### Findings at 16915 SW 94th Court. Client's residence:

Month of October 2014

After thoroughly restructuring client's network operating systems, I have observed and assisted client to resolve several anomalies which continue. All of the incidents have been external and disrupt the client and are not related to the operating systems. On October 11, client called me upon returning home after taking a week off and reported that his U Verse modem was not responding, denying him access to the internet or TV. Client called ATT and was able to resume service after walking him through a hard reset of the modem. On October 12, Client showed me the modem error-log from October 7 – 12. The logs indicated several intrusion attempts but according to the reports, however they appeared to be unsuccessful. According to client, ATT found nothing on their end and could not identify the source or cause of modem failure and escalated the call. ATT advised client that the only possibility of this occurrence would require the hacker to be close enough to access his wireless signal in order to hack in



# Maxcent Consulting

6800 SW 40 Street #683
Miami, FL 33155

his modem. I completed a full system check of client's computers and modem and found nothing suspicious and reset all passwords. Everything appeared to be working normally.

Also in October, client forwarded me several emails when using the Genesis email address Dave@genesismanagement.us, hosted at Go-Daddy web-mail server. All of his forwarded emails contained strings of various coded characters, anywhere between three lines to a full page. Client first showed me numerous copies of these strange codes embedded in his emails beginning around January of 2014. These character coding appeared on his Genesismanagment.us thread when client was corresponding to or copying, individuals using emails in the HCNetwork.org domain and to his former attorney Leon Sharpe using sharpe_associates@msn.com. The insertion of any foreign content, not part of the original transmission can only occur if the travel path of the data packets have been interrupted. I could not de-code any associated command or purpose. We conduct tests using the same content directly to from his local outlook mail, bypassing the Go-Daddy webmail host, or by using another domain owned by client, we could not duplicate any of the special characters.

I called Go Daddy tech support in regards to the characters and they could not explain why characters would appear when using their webmail and that client would have to contact their legal department to obtain detailed reports which the service support techs have access to. Client contacted Go-Daddy executive support and copied me several times and we have not yet received any response. The emails containing special characters disappeared once client received a notice of termination from HCN and attorney on October 31.

Month of November 2014

Client called me after troubleshooting with ATT tech support on November 21 due to his inability to access specific Websites. Client claimed he was having the same issue trying to access websites of specific law-firms and government agencies over the past four years. Client reported this anomaly to ATT that he was specifically being denied access the website of the law firm, www.forthepeople.com. Client stated he had previously been searching how to locate and contact the recent gubernatorial candidate Charlie Crist. The search engine listed the top three links, however for three days and the browser timed-out, indicating the error message - **unable to locate server.** Client indicated he checked several other websites without issue. Client stated he checked and was able to access the same link on his T-Mobile cell phone browser. Client stated he then switched internet service connections from his ATT Uverse modem to his mobile hotspot and was immediately able to access the domain being blocked using the internet service provided by U Verse. According to ATT tech support, they did not find anything on their end causing the denial of server, nor did they encounter any indication that his modem was malfunctioning. ATT conducted tests of modem with client and when this failed, an order was placed to dispatch a supervisor for the service call and exchange the modem.

When I arrived at client's residence on November 24, the ATT technician advised me he ran a system check and again found nothing and the modem logs did not show that the firewall had been penetrated. Client demonstrated to the ATT technician and myself, the same anomaly, he was encountering and denying him access to www.forthepeople.com domain when using the ATT modem. After several unsuccessful tests in my presence to access the site, the ATT technician switched client's modem and the domain was immediately accessible. ATT technician informed us that someone would have had to

Maxcent Consulting 6800 SW 40 Street #683 Miami, FL 33155 Phone 305-503-2923

http://www.maxcentconsulting.com





**M** **axcent**
**C** **onsulting**
6800 SW 40 Street #683
Miami, FL 33155

conduct this wirelessly, but he claimed that he did not have the knowledge of how someone could manually configure a modem to block a specific IP address and not leave a trace. The technician advised us that in five years at ATT, he had only encountered the same situation only once before. According to the technician, the only other incident reported in his territory was a little over a year ago, by a real estate company, where he found that the Miami-Dade.gov Portal for property tax-payer IP address was blocked and denying the users at the firm access.

**Cell Phone issues;**

Client reports that he continues to experience issues when dealing with legal matters when communicating to his lawyers from his cell phone. Client has made several calls to the T-Mobile executive offices, changed out his phone, passwords but continues to experience the same. On one occasion, in my presence client received a follow-up recorded call from the T-Mobile executive staff. During the call, client stated repeated that privileged communication to his lawyers continue to be known by others, as well as abnormal screen fluctuations. T Mobile reviewed with client all security measures advised in the previous call, which client stated he had complied with. HIs conversation with T Mobile ended by the representative assuring client that it was not possible for any hacker to remotely control a secured phone, and that only Law-Enforcement would have this capability of the problems he was experiencing.

## Conclusion:

In my previous recommendation, I suggested that if client was not receiving assistance from local law-enforcement, then he should report the complaints to the FBI. Under the current situation, the types of attacks, irregularities, and occurrences are not system errors and cannot occur with the security measures I have in place. I cannot assist client to secure data once packets have left the ports of the network. Once the data leaves client's network, there are only two possible sources where data is transferred or passes through. The primary portal is when it passes through the ISP server to be forwarded, and the other would be when incoming packets travel through the email host, such as Go Daddy. In client's case and COMCAST ISP, in his office and ATT in his home. There are no system issues causing the irregularities or compromises inside client's network at his office or home.

In regards to client's cell phone issues, I saw two phone itemization logs from T-mobile printed 30 days apart for the same billing cycle. The latter print-out displayed a week of calls missing. Client showed me the medical records dated in the same period, when he was hospitalized. He stated that he provided the first printout when he received death threats which he reported to the MDPD public corruptions unit. This is something which can only be possible by someone working for the carrier having authority to access higher-level confidential data logs.

Jose A Meneses
President
MCSE & CCNA



IN THE CIRCUIT COURT OF THE
JUDICIAL CIRCUIT, IN AND FOR
DADE COUNTY, FLORIDA

CASE NUMBER:
ID NUMBER:
CORAL MARTINEZ
GATOR

NOTICE OF INTENT TO INSTALL DRIVER'S LICENSE SUSPENSION



HARVEY RUVIN
Clerk

BARBARA VIDAL
Deputy Clerk